FIRST TRUST COMPANY OF SAINT PAUL, a Minnesota corporation, as Executor of the Last Will and Testament of Sophia V. H. Foster, Plaintiff,

v.

MINNESOTA HISTORICAL SOCIETY, a Minnesota corporation, Ogden H. Hammond as Executor of the Last Will and Testament of Sophia W. Hammond, deceased; Ogden H. Hammond and Clarence V. S. Mitchell, as trustees of a testamentary trust under said will for the benefit of Margaret Van S. H. Starr; Harriet K. Hammond; and John Doe and Mary Roe, whose true names are to plaintiff unknown, Defendants.

MINNESOTA HISTORICAL SOCIETY, a Minnesota corporation, Third-Party Plaintiff,

v.

Elizabeth F. VYTLACIL, Harriet F. Bunn, and Roger Sherman Foster, Third-Party Defendants,

and

United States of America, Intervener.

In re LEWIS AND CLARK EXPEDITION PAPERS.
Civ. No. 2553.

United States District Court
D. Minnesota, Third Division.
Oct. 8, 1956.

Bergmann Richards and Richards, Janes, Hoke, Montgomery & Cobb, Minneapolis, Minn., for Minnesota Historical Society, a defendant and third-party plaintiff.

M. V. Seymour and O'Brien, Horn, Seymour & O'Connor, Saint Paul, Minn. (Donald F. Hyde, Frederic H. Poor, Jr., and W. Dermot H. Stanley, of McKenzie, Hyde, Willson, French & Poor, New York City, of counsel), for defendant Ogden H. Hammond, as Executor of the Last Will and Testament of Sophia W. Hammond, deceased, defendants Ogden H. Hammond and Clarence V. S. Mitchell, as Trustees of a Testamentary Trust under said will for the benefit of Margaret Van S. H. Starr, and defendant Harriet K. Hammond.

Elizabeth F. Vytlacil, Harriet F. Bunn and Roger Sherman Foster, third-party defendants, pro se.

George E. MacKinnon, U. S. Atty., and Clifford Janes, Asst. U. S. Atty., Saint Paul, Minn., and Harold F. Reis, Atty., U. S. Dept. of Justice, Washington, D. C., for the United States.

NORDBYE, Chief Judge.

Certain issues in the above cause came before this Court for determination without a jury.

This action was instituted originally by the filing of a complaint in the District Court of the County of Ramsey, State of Minnesota, by the First Trust Company of Saint Paul, as executor of the last will and testament of Sophia V. H. Foster, deceased. Mrs. Foster, a lifelong resident of Saint Paul, died in New York City on December 20, 1952. After her death, there was found in the attic of her home in Saint Paul certain papers referred to in the complaint as Lot A and Lot B. Lot A consisted of various miscellaneous papers belonging to her family, among which were the personal diaries of her father, John Henry Hammond, a well-known Civil War general, who died in Saint Paul on April 30, 1890. Lot B consisted of certain documents ostensibly authored by William Clark, and constituted, according to the com-

plaint, contemporary original records of the so-called Lewis and Clark Expedition. The complaint sought to quiet the executor's title to both of the lots in question. The named defendants were the Minnesota Historical Society, a Minnesota corporation, which was in possession of the documents, and certain other individuals.

Prior to the institution of the suit, a claim apparently had been made that the documents in question constituted the unadministered remnants of the Estate of Sophia W. Hammond, the wife of General Hammond, and the mother of Sophia V. H. Foster. Defendant Harriet K. Hammond is a sister of Mrs. Foster and a daughter of General and Mrs. Hammond, and she is entitled to a one-half interest in the residue of Mrs. Hammond's estate. Margaret Van S. H. Starr, the youngest daughter of General and Mrs. Hammond, is the beneficiary of a testamentary trust which is entitled to the other half of the residue of Mrs. Hammond's estate. Therefore, Ogden H. Hammond and Clarence V. S. Mitchell, co-trustees of the testamentary trust, were named as defendants. In addition, Ogden H. Hammond was named a defendant as executor of the last will and testament of Sophia W. Hammond. These defendants will hereafter be referred to as the Hammonds. Thereafter, by order of the State Court, Elizabeth F. Vytlacil, Harriet F. Bunn, and Roger Sherman Foster, grandchildren of General Hammond, were named as third-party defendants. They will be referred to as the Fosters. That order was made in pursuance of a third-party complaint filed by the Minnesota Historical Society in which it was asserted that the Fosters had made a gift of the documents to that Society. The Fosters filed an answer denying the gift and filed an agreement whereby they assigned to the Hammonds whatever interest the Court might determine that they had in Lot B, subject to certain conditions not relevant to the issues now before this Court. The complaint also noted as defendants John Doe and Mary Roe, seeking thereby to include as defendants any others who might have an interest in Lot B, including those who might assert title or a claim through William Clark.

Later, the United States was granted permission to intervene and has intervened in the proceeding seeking to quiet title to Lot B. Thereupon, the matter was removed from the State Court to this Court. The Government claims a paramount title to the documents referred to as Lot B. It makes no claim to the documents comprising Lot A. The Minnesota Historical Society asserts a lien on the documents in Lot B for services performed in connection therewith. By virtue of an order of this Court, a separate trial of the issues between the United States and the other parties hereto was directed to be held prior to trial of the other issues in this proceeding. The only matter now before the Court, therefore, involves the documents referred to as Lot B and the Government's paramount claim of title thereto.

After the death of Mrs. Foster, Mrs. Vytlacil, the granddaughter of General Hammond and one of the daughters of Mrs. Foster, came to Saint Paul late in December, 1952, to dispose of the home of her late mother and its contents. In rummaging through the attic, she came upon General Hammond's desk, which contained his Civil War diaries and certain other papers. Apparently without realizing the historical significance of the documents other than the diaries, she called the Minnesota Historical Society and informed the curator of manuscripts that there were certain papers of her grandfather's in which the Society might be interested. Lucile M. Kane, the curator, went to the Foster home, and on January 7, 1953, found the documents in suit in a desk and desk top in the attic. The greater part of the documents in suit were wrapped in a copy of the National Intelligencer, a newspaper which is not dated but is noted as Volume 5; the approximate year of its issue is estimated to be November, 1805. The documents were covered with dust and gave every appearance of having remained

undisturbed for a substantial period of time.

After the documents in Lot B had been examined by the Minnesota Historical Society, they were identified as the original notes of William Clark, generally referred to as Captain Clark of the Lewis and Clark Expedition. These notes apparently were written by a quill pen and on separate pieces of paper of various kinds, from the size of a postcard to between 20 and 30 inches in length. Some of the notes were written on pieces of paper which had been used originally to enclose letters sent to Captain Clark before the Expedition commenced its journey. This was in the era before the use of envelopes. Sometimes the writing would be across the name of the addressee on one side of such a paper. The notes were replete with cross-outs, additions, ink spots and ink finger prints. Clark was not a literate man; he had no formal education after he was 14 or 15 years old and was of the frontier school. He was born in 1770. His use of good English was limited, and the misspelled words and crowded and often illegible writing on the various scraps and pieces of paper he used made it exceedingly difficult to decipher the text. Some of the entries were undated.

The work of the deciphering, transcription, and chronological arrangement of the Clark notes was performed for the Historical Society by Ernest S. Osgood, Professor of History at the University of Minnesota, with the assistance of certain members of its staff. This group worked off and on for over a year before their task was completed. The difficulty of their work was enhanced not only by the illegible writing, excisions, interlineations and blots, but also by the fact that at times when Clark had entered all of the events he endeavored to record for one day, he would continue the recordings of that day on another undated scrap of paper, which required extreme care and study in order to determine its chronology. The documents have been listed and arranged chronologically by Professor Osgood and numbered from 1 to 68, inclusive. No. 68 is the copy of the National Intelligencer. Attached to the complaint herein is found his enumeration of the papers comprising Lot B, and which are listed as follows:

"(Identified as rough daily notes of Captain William Clark made at the winter camp opposite the mouth of the Missouri in the winter of 1803–4 and those made on the first leg of the Lewis and Clark Expedition up the Missouri to Fort Mandan and during the winter of 1804–5 before leaving for the mountains and the Pacific).

### Checklist

Document Number:

1. Dec. 13, 1803—Dec. 21, (1803)
2. Dec. 22, 1803—Dec. 30, (1803)
3. Dec. 31, (1803)—Jan. 3, 1804
4. Jan. 4, 1804—Jan. 6, (1804)
5. Jan. 6, (1804)—Jan. 17, (1804)
6. Jan. 18, (1804)—Jan. 21, 1804
7. (Jan.) 21, 1804—Jan. 31, (1804)
8. Jan. 31, (1804)—(Mar.) 25, (1804)
9. Mar. 26, 1804—(April) 13, (1804)
10. April 13, 1804—(April) 28, (1804)
11. April 29, 1804—(May) 14, (1804)
12. May 14, 1804—May 24, (1804)
13. May 23, (1804)—May 24, (1804)
14. May 25, (1804)—May 29, (1804)
15. May 30, (1804)—June 2, (1804)
16. June 3, 1804—June 4, 1804
17. June 5, (1804)
18. June 6, 1804—June 9, (1804)
19. June 10, 1804—June 14, (1804)
20. June 15, 1804—June 16, (1804)
21. June 17, (1804)—June 21, 1804
22. June 22, (1804)—June 26, (1804)
23. June 26, (1804)—June 29, (1804)
24. June 29, 1804—July 1, 1804
25. July 2, 1804—July 4, 1804
26. July 5, 1804—July 6, (1804)
27. July 7, 1804—July 8, (1804)
28. July 9, 1804—July 12, (1804)
29. (July 13, 1804)—July 15, 1804
30. July 16, 1804—July 19, (1804)
31. July 19, 1804—July 20, 1804
32. July 21, (1804)—July 22, (1804)
33. July 22, 1804—July 26, (1804)
34. July 27, (1804)—July 29, (1804)
35. July 30, (1804)—Aug. (3), (1804)

36. Aug. 3, (1804)—Aug. 7, (1804)
37. Aug. 8, 1804—Aug. 11, 1804
38. Aug. 12, 1804—Aug. 15, (1804)
39. Aug. 16, 1804—Aug. 24, 1804
40. Aug. 25, 1804
41. Aug. 25, (1804)—Aug. 29, 1804
42. Aug. 30, 1804—Aug. 31, (1804)
43. Aug. 31, 1804
44. Aug. 31, (1804)
45. Sept. 1, 1804—Sept. 7, 1804
46. Sept. 8, 1804—Sept. 10, (1804)
47. Sept. 10, 1804—Sept. 13, 1804
48. Sept. 14, 1804—Sept. 16, (1804)
49. Sept. 17, 1804—Sept. 20, 1804
50. Sept. 20, 1804—Sept. 23, 1804
51. Sept. 22, 1804—Sept. 26, (1804)
52. Sept. 27, 1804—Sept. 28, 1804
53. Sept. 29, 1804—Oct. 24, (1804)
54. Oct. 25, 1804—Oct. 27, 1804
55. Oct. 28, 1804—Oct. 29, 1804
56. Oct. 30, 1804—Nov. 6, (1804)
57. Nov. 19, 1804—April 3, (1805)
58. Feb. 23, 1805
59. 1805, Number of officers and men to protect Indian trade. p. 2, 'Mileage and latitude to the mouth of the River Que courre * * * to the Mouth of the Muddy Creek'
60. 1806, Distance from St. Charles to River Jacque.
61. Undated. Miles and latitude from River Dubois to Grand de Touit.
62. Undated. 'The Osage and the Kansies are the same language * * *'
63. Undated. 'The Plains of this Country * * *'
64. Undated. 'About the center of this Sand Island * * *'
65. Undated. 'Have crossed from the Top of this Mound * * *'
66. Undated. 30th to Dec. 1 (1804)
67. Undated. 13th to 18th (Nov. or Dec., 1803)
68. The National Intelligencer. Vol. V."

The documents listed above numbered 59, 60 and 61 are computations of certain distances in and along the Missouri River, and those numbered 62 to 66, inclusive, are incorporated in several of the other documents. No. 67 should be placed chronologically so as to precede Document No. 1.

In this proceeding, the notes kept by Captain Clark may be divided into two sections—those made when the party was at the base camp at Camp Dubois near the mouth of the Missouri River from December 13, 1803, to May 13, 1804, and the remainder during the first leg of the journey up the Missouri to the land of the Mandans, which commenced on May 14, 1804,[1] and the wintering there until about April 3, 1805. According to the opinion of a handwriting expert, the notes are all in the handwriting of Captain Clark except a few lines in some seven of the documents which were entered by Captain Meriwether Lewis and three entries or so made by an unidentified person or persons.

At the time President Jefferson first conceived of the desirability and necessity of an expedition to explore the Missouri River and "its course and communication with the waters of the Pacific Ocean," he then recognized that the expedition, military in character, would enter into lands owned by a foreign nation with which the United States was at peace and that the utmost secrecy had to be observed. The activities of Spain, France and England in this vast Northwest Area gave him alarm and concern. On January 18, 1803, President Jefferson sent a secret message to Congress (7 Thwaites 206–09)[2] asking for the authorization of what is now known as the Lewis and Clark Expedition, so as to give it an official status and the necessary appropriation from Congress for the expense thereof. Captain Lewis had been President Jefferson's secretary, and no

1. It would appear that Clark's actual journey did not get under way until May 14, 1804, although the date of the commencement of the trip up the Missouri is generally noted as May 13, 1804.

2. The letters and documents quoted herein, unless otherwise designated, are from "Original Journals of the Lewis and Clark Expedition," Thwaites' edition, published in 1904–05 in eight volumes, portions of which were admitted in evidence.

doubt his close association with Lewis and his knowledge of the latter's outstanding qualifications for the proposed expedition prompted the President to appoint him as the leader. Upon the passage of the Act by Congress in response to Jefferson's message of January 18, 1803, and the appropriation of $2,500 for the expense of the Expedition, the President notified Lewis in May, 1803, of his appointment, and then on June 20, 1803, sent him detailed instructions. (7 Thwaites 247). There can be no doubt from a reading of those instructions that it was an official government expedition and military in the sense that the members were composed of volunteers enlisted in the United States Army, with Captain Lewis as the commander. Military discipline was to be strictly enforced. In writing Lewis, Jefferson outlined in great detail not only the necessity of the observations which should be made, but also the importance of making and preserving a record of the observations and notes on the numerous subjects outlined in the instructions. Jefferson was meticulous and painstaking in directing the manner of recording and the preservation of the notes and observations. He directed Lewis, among other things,

"Your observations are to be taken with great pains & accuracy, to be entered distinctly, & intelligibly for others as well as yourself, to comprehend all the elements necessary, with the aid of the usual tables, to fix the latitude and longitude of the places at which they were taken, & are to be rendered to the war office, for the purpose of having the calculations made concurrently by proper persons within the U. S. several copies of these, as well as your other notes, should be made at leisure times & put into the care of the most trustworthy of your attendants, to guard by multiplying them, against the accidental losses to which they will be exposed. a further guard would be that one of these copies be written on the paper of the birch, as less liable to injury from damp than common paper." (7 Thwaites 248).

Jefferson's instructions to Lewis also contained the following:

"In re-entering the U. S. and reaching a place of safety, discharge any of your attendants who may desire & deserve it, procuring for them immediate paiment of all arrears of pay & cloathing which may have incurred since their departure; & assure them that they shall be recommended to the liberality of the legislature for the grant of a soldier's portion of land each, as proposed in my message to Congress & repair yourself with your papers to the seat of government." (7 Thwaites 252).

William Clark was Lewis' friend and he was asked by Lewis to accompany him on the Expedition. On June 19, 1803, Lewis wrote Clark in part as follows:

"From the long and uninterrupted friendship and confidence which has subsisted between us I feel no hesitation in making to you the following communication under the fulest impression that it will be held by you inviolably secret untill I see you, or you shall hear again from me.

"During the last session of Congress a law was passed in conformity to a private message of the President of the United States, intitled 'An Act making an appropriation for extending the external commerce of the United States.' The object of this Act as understood by its framers was to give the sanction of the government to exploreing the interior of the continent of North America, or that part of its bordering on the Missourie & Columbia Rivers." (7 Thwaites 226).

On July 17, 1803, Clark accepted Lewis' invitation and in due time arrived at Camp Dubois on the Wood River near the mouth of the Missouri River. From December 13, 1803, to May 14, 1804, Clark kept rough notes at Camp Dubois of the preparations being made. Lewis

came down the Ohio River from Pittsburgh, and for a time he likewise kept a diary. There is no indication that the notations kept by Lewis and Clark when they were in the United States were recorded in response to Jefferson's directions to Lewis. Clark's notes pertained to the activities of the personnel of the Expedition, etc., at Camp Dubois, which was not far from St. Louis, then a well-known town within the confines of the United States. Obviously, both Lewis and Clark, embued with enthusiasm over the great adventure which confronted them and aware of the returns to them by way of the publication rights of their memoirs, would maintain diaries and notes of the Expedition regardless of any duty devolving upon Lewis as leader of the Expedition to conform with the instructions of Jefferson in this regard. It is important also to note that, before the Expedition started from Camp Dubois on or about May 14, 1804, the Louisiana Purchase had been made and ratified so instead of a secret military expedition into a foreign country, the Lewis and Clark Expedition, while primarily directed to the establishment of an overland route over the Missouri to the Pacific and the gathering of information as to minerals and the flora and fauna of those regions, also was destined to become a good-will mission to the various Indian tribes who inhabited the new territories of the United States. Secrecy as to the Expedition no longer was necessary. Clark was second in command of the Expedition. Although his expected commission as Captain, as promised by Jefferson, never was attained due to certain army regulations, he was commissioned, however, as a Second Lieutenant. But he was a co-leader with Lewis, and there is every indication in the history of the Expedition that Lewis considered Clark as an officer in joint command; in fact, Lewis always referred to him as Captain Clark.

The portion of the notes in controversy kept by Clark at Camp Dubois consist of his purely personal recountings of the daily events, such as the people who visited the camp and a recital of their tales and stories, the records of the roll of members of the Expedition, the hunting experiences of the men, their illnesses and escapades, computations as to the time it would take to reach the various points in the contemplated trip to the Pacific, the dealings with contractors for provisions, and the recital of numerous other incidents which occurred. It is quite probable that Lewis may have known that Clark was keeping a diary for this period, and hence after he joined Clark he did not continue with his own journal which he had commenced when he left Pittsburgh. However, that both Lewis and Clark were keeping notes for their own personal reasons preparatory to the commencement of the Expedition seems obvious. There is no evidence that Clark ever attempted to rewrite these notes in more legible or finished form as he did with reference to the notes kept when the Expedition was under way.

It was suggested by some historians who were witnesses herein that the condition of Clark's notes from May 14, 1804, to April 3, 1805, would indicate that they were made in part during the actual progress of the boats up the Missouri, with the attendant erratic movements of the craft which made writing extremely difficult. It is inconceivable that Clark ever intended that these notes should be anything more than the basis for a more finished and legible account of the diary which he was keeping. That these notes of the trip from Camp Dubois to the Mandans were copied later or rather used by Clark as a basis for his permanent pocket diaries or journals is convincingly established by the evidence. No one knows when the permanent pocket journals of Clark of the journey from Camp Dubois to the Mandans were written, but it is fair to assume that during Clark's leisure, possibly during the months in 1804 and 1805 when the Expedition wintered at the Mandans, much of the transcribing and finishing and editing of these field notes was performed by him.

When the Lewis and Clark Expedition was preparing to leave Fort Mandan, which was located near what is now known as Bismarck and Mandan, North Dakota, Lewis wrote President Jefferson a letter under date of April 7, 1805. He stated that he was forwarding to the President an invoice of certain articles, including some 67 specimens of "earths, salts and minerals; and 60 specimens of plants", together with a great deal of other material. (7 Thwaites 318). A barge with a crew of some ten men was sent from Fort Mandan down the Missouri to St. Louis with letters, messages, and the various articles being sent to the President. In this same letter, Lewis also stated,

"You will also receive herewith inclosed a part of Capt. Clark's private journal, the other part you will find inclosed in a separate tin box. this journal (is in it's original state, and of course incorrect, but it) will serve to give you the daily detales of our progress, and transactions. (Capt. Clark dose not wish this journal exposed in it's present state, but has no objection, that one or more copies of it be made by some confidential person under your direction, correcting it's gramatical errors &c. indeed it is the wish of both of us, that two of those copies should be made, if convenient, and retained untill our return; in this state there is no objection to your submitting them to the perusal of the heads of the departments, or such others as you may think proper. a copy of this journal will assist me in compiling my own for publication after my return.) I shall dispatch a canoe with three, perhaps four persons, from the extreem navigable point of the Missouri, or the portage betwen this river, and the Columbia river, as either may first happen; by the return of this canoe, I shal send you my journal, and some one or two of the best of those kept by my men. I have sent a journal kept by one of the Sergeants, to Capt. Stoddard, my agent at St. Louis, in order as much as possible to multiply the chances of saving something. we have encouraged our men to keep journals, and seven of them do so, to whom in this respect we give every assistance in our power." (7 Thwaites 318–19).

And it is significant that in the notes of Clark in controversy, the following entry is found under April 2, 1805,

"We are writeing and prepareing dispatches all day—I conclude to Send my journal to the President of the United States in its original State for his own perusal, untill I call for it or Some friend if I should not return an[d] this Journal is from the 13th of May 1804 untill the 3rd of April 1805."

In the files of the Missouri Historical Society at St. Louis, there is a rough draft of a letter that Clark intended to send to President Jefferson. It is dated at Fort Mandan, April 1, 1805. Clark began the letter as follows:

"Sir

As Capt Lewis has not leasure to write a correct copy journal of our" [the following words are illegible]

This entire line was crossed out by Clark and the following line substituted:

"It being the wish of Capt Lewis I take the liberty"

Then appear certain corrections, but the letter continues,

"to send you for your own perusal the notes which I have taken in the form of a journal in their original state. You will readily perceive in reading over those notes that many parts are incorrect, owing to the variety information received at different times. I most sincerely wish that leasure had permited me to offer them in a more correct form. receive I pray you my unfained acknowledgments for your friendly recollection of me in your letters to my friend and companion Capt. Lewis, and be assured of the sincere

regard with which I have the honor to be

Your most Obt. & Humble Servt." (Photostatic copy, Hammond Ex. 5).

It seems entirely probable that Clark's journals reached the President by way of the return trip of the party sent down the Missouri early in April, 1805. Although Jefferson makes no mention of Clark's journal in his message to Congress in 1806, he does refer to Lewis' letter of April 7, 1805, from the Mandans, stating,

"In pursuance of a measure proposed to Congress by a message of January 18, 1803, and sanctioned by their approbation for carrying it into execution, Captain Meriwether Lewis, of the First Regiment of infantry, was appointed, with a party of men, to explore the river Missouri from its mouth to its source, and, crossing the highlands by the shortest portage, to seek the best water communication thence to the Pacific Ocean; and Lieutenant Clarke was appointed second in command. They were to enter into conference with the Indian nations on their route with a view to the establishment of commerce with them. They entered the Missouri May 14, 1804, and on the 1st of November took up their winter quarters near the Mandan towns, 1,609 miles above the mouth of the river, in latitude 47 degrees 21' 47" north and longitude 99 degrees 24' 45" west from Greenwich. On the 8th of April, 1805, they proceeded up the river in pursuance of the objects prescribed to them. A letter of the preceding day, April 7th, from Captain Lewis is herewith communicated." (7 Thwaites 328).

Clark's rough notes, with the exception of some daily entries made by Lewis and the incidental writings of others therein, are the efforts of a frontier-educated man to keep notes of the daily occurrences of the Expedition. And when Clark sent his journal or journals to the President at Lewis' request, it seems quite obvious that they were furnished to him for his own perusal and not as official documents of the Expedition. It was expected that in due time Lewis' journal for that period would be completed. Professor Osgood, who spent many laborious hours over a period of months in deciphering and collating these notes, had no hesitancy in stating that this record of the trip up the Missouri was substantially the same as that reflected in the entries made by Clark later in his three pocket journals; that they contained the same general scope and field of information. (Osgood, Tr. 210). The daily distances and courses traveled as stated in the notes herein are the same as those stated in the pocket journals. True, there are some differences which may be noted in the recording of the happenings on certain days. Some observations made in the notes herein do not appear in Clark's journals, and many entries are to be found in the journals which are more complete and finished than those which appear in the rough notes. Moreover, these rough notes in controversy do not represent Clark's complete diary between May 14, 1804, and April 3, 1805. There are many omissions from November 4, 1804, to March 25, 1805. The daily entries, however, in Clark's journals for this period, as published in Thwaites, Volume 1, are complete.

The notes here in controversy were received in evidence in camera and hence the Court is not at liberty to quote extensively from them so that a comparison may be made between the entries therein and those found in the pocket journals, but no one questions Professor Osgood's conclusion that in Clark's three pocket journals is to be found substantially all of the information to be gleaned from the portion of the notes in question made when the Expedition was under way up the Missouri.

The Government's position is that Lewis, as the leader of the Expedition, was under strict injunction by President Jefferson to prepare notes in the course

of a military expedition; that the President expressly ordered Lewis to make a written record of his observations by way of a "journal, notes and observations of every kind." (7 Thwaites 251). Therefore, it is argued that Clark, who was a co-commander with Lewis, was likewise within the ambit of Jefferson's instructions and that these rough notes became, and continued to be, the property of the Government; that is, that they belonged not to the officers of the Expedition but became the property of the State. It is pointed out that the Government went to great expense, considerably more than the $2,500 appropriated by Congress, in financing the Expedition, and that, generally speaking, the work product of government officers should belong to the Government. The Government urges that, although President Jefferson's letter of June 20, 1803, was directed to Captain Lewis, it necessarily governed Captain Clark, who actively participated in the Expedition as co-commander. It reasons that Lewis, with his manifold duties, necessarily was required to allocate some of his responsibilities to his co-commander, and in this regard reference is made to the fact that the entries in the rough notes of Clark here in question included some entries by Lewis. In addition, the Government urges that there is circumstantial evidence that these rough notes came into Hammond's possession when he liquidated the Central Superintendency of Indian Affairs at Lawrence, Kansas, in 1878; that the predecessor of this agency was the St. Louis Superintendency of which William Clark, then General Clark, was superintendent in 1807, and where he remained either as superintendent or ex officio as such as Governor of the Missouri Territory until his death on September 2, 1838.

In reading Clark's rough notes from May 14, 1804, to April 3, 1805, as transcribed by Professor Osgood, there are, of course, many personal references to daily events which would be of no assistance to the Government in the achievement of the primary purposes of the Ex-

pedition. Moreover, such personal references would be of no value to the Government with respect to scientific data, the mineral resources in the area, its flora and fauna, or information about the Indian tribes in the region. On the other hand, there are entries in Clark's rough notes which may be said to be consistent with the instructions given to Lewis by President Jefferson in his letter of June 20, 1803, but, as stated, substantially all of such material entries are to be found in the pocket journals of Clark.

Whether Lewis kept notes during the journey up the Missouri to the Mandans is a subject upon which historians may differ. However, there is substance to the position that Lewis kept, or intended to write up, a journal for this period, but his efforts in that regard were not completed on April 7, 1805, so he decided to send President Jefferson Captain Clark's private journal. Support for this position is found in Clark's rough draft of his proposed letter to Jefferson dated April 1, 1805, reference to which has been made heretofore, and in Lewis' letter to the President from Fort Mandan dated April 7, 1805, in which he informed Jefferson that he would dispatch his own journal later. But that Lewis was carrying out President Jefferson's instructions of June 20, 1803, in other ways is indicated in his letter of April 7, 1805, in which he stated,

"I have transmitted to the Secretary at War, every information relative to the geography of the country which we possess, together with a view of the Indian nations, containing information relative to them, on those points with which, I conceived it important that the government should be informed. (If it could be done with propriety and convenience, I should feel myself much obliged by your having a copy taken of my dispatches to the Secretary at War, on those subjects, retaining them for me untill my return.)" (7 Thwaites 319).

However, whether Lewis kept a daily journal during the period from May 14,

1804, to April 3, 1805, is of no controlling importance herein. If Clark was keeping daily notes at Lewis' request in order to comply with President Jefferson's instructions, all of the material information recounted by Clark in such notes was made available to President Jefferson and the Government in the forwarding by Clark on April 7, 1805, of the three journals now known by historians as Codices A, B and C.

There are now extant, among other data of the Lewis and Clark Expedition deposited with the American Philosophical Society of Philadelphia, three journals written by Clark, sometimes referred to as leather-covered and marble-covered codices. These journals were deposited with the Society by Nicholas Biddle on April 8, 1818, with the consent of both Jefferson and Clark. In 1814 Biddle had published a history of the Lewis and Clark Expedition and much of the pertinent data thereof had been left with him. It is evident from a perusal of Biddle's publications that he made free use of other available sources of information concerning the Expedition, including personal interviews with Captain Clark. It is not necessary to recount here in detail the difficulties which Lewis encountered in the publication of the journals of the Expedition after his return in 1806, his untimely and tragic death on October 11, 1809, the similar difficulties with reference to publication which harassed Clark, and the decision of Jefferson and Clark to leave 14 volumes of the Lewis and Clark journals, together with other documents, in trust with the American Philosophical Society.

It was on January 20, 1893, that one Elliott Coues, an eminent scientist and traveler, made a report to the American Philosophical Society in which he arranged the bound books and loose papers of the Expedition deposited with the Society in a series of codices which he designated as Codex A to T, inclusive. Codex A was Clark's journal up the Missouri River from Camp Dubois for the period of May 13 to August 14, 1804. Codex B consists of Clark's journal from August 15 to October 3, 1804, and Codex C covers Clark's journal from October 4, 1804, to April 7, 1805, when the Expedition left the Mandans. Coues also noted as Codex Aa the entries of Lewis on the 15th and 20th of May, 1804; Codex Ba the entries made by Lewis on the 16th and 17th of September, 1804. These entries, for chronological continuity, were made a part of Codices A and B. These codices, however, do not cover the period when the Expedition was quartered at Camp Dubois from December 13, 1803, to May 13, 1804. Apparently the rough notes in controversy are the only known record extant of the daily events concerning Clark and the Expedition during that period. But, as mentioned heretofore, Camp Dubois was within the territory of the United States before the Louisiana Purchase, and the notes of Captain Clark during that period could not be anything more than his own personal jottings of interest to himself and Lewis before the Expedition was under way.

█ It is apparent that Lewis encouraged all of his men, who were sufficiently literate, to keep diaries, and some of the members of the Expedition, such as Sergeant John Ordway, Patrick Gass, Charles Floyd and Nathaniel Pryor, did so. The Government made no claim to any of these notes and observations, though these men, as well as Clark, were paid members of what the Government terms a military expedition. In fact, Clark bought Sergeant Ordway's journal when the publication of the Lewis and Clark Expedition papers and documents was being furthered by him. And it must be emphasized that Jefferson recognized that the publication of the journals, notes and observations of Lewis and Clark was to be the source of some of the rewards which they were to receive in return for the accomplishment of one of the most important missions in American history. The Government, however, assumed no part of the burden of the financial responsibility of such publication. Although when Clark was having difficulty after Lewis' death in obtaining editors and publishers for the vast amount.

of material which had been accumulated, there will be found in some of Jefferson's letters statements that Lewis' journals, particularly as to the scientific data of the Expedition, then in possession of third parties preparatory to contemplated publication, belonged to the Government in that such documents were the fruits of an expedition financed by the Government at great expense, there is an absence of any substance to the contention that in such statements he could have contemplated the portion of the rough notes of Clark which already had been transcribed into permanent journals. What possible aid or assistance could these notes in controversy, which required months of study by Professor Osgood to transcribe, have been to the Government in 1806? The daily latitude and longitude observations, the courses and mileage of the journey, and all other pertinent information had been rewritten in the journals by Clark in a more legible and intelligent manner. There is no showing here that his original notations made on indiscriminate scraps of paper would have been of more aid to the scientists, cartographers, the War Department, or others, than the finished journals for that period. The situation must be considered as it existed after Clark's return, and not as of today when such original notes and data may be of great historical interest to scholars or have a real value as collectors' items. The Government was not concerned with such aspects of the papers in 1806. Certainly, every inference to be deduced from the evidence herein supports the contention that Captain Clark considered these notes as his personal property.

As stated heretofore, it should not be necessary to recite in detail the trials and tribulations of Lewis and Clark with reference to the publication of the varied material accumulated by them on their expedition. However, the Government emphasizes certain statements of Jefferson in his correspondence after he had left the Presidency which it contends reflect his views as to the true owner of certain portions at least of the Lewis and Clark documents and material. It should be noted that at this time, 1806 to 1818, the Government had no official depository for such documents. There was no National Archives. Jefferson was concerned that the public should have the benefit of the information gathered by the Expedition and was interested primarily in furthering Lewis' plans for its publication. After his return, Lewis had been appointed Governor of the Territory of Louisiana and was busy with his duties as such far removed from Washington. It appears that in 1807 Lewis had engaged one John Conrad to publish his account of the Expedition. This plan, however, failed of achievement. On August 16, 1809, Jefferson inquired of Lewis as to the progress of the work looking towards the contemplated publication. Later that year when Lewis was returning to the East with trunks containing a mass of material with respect to the Expedition, he met with his death. Clark then attempted to find the property and documents Lewis had gathered for the intended publication. Thereafter, Clark made arrangements whereby Benjamin Smith Barton, an eminent scientist of Philadelphia, was to publish certain scientific data of the Expedition; Nicholas Biddle, a young lawyer and diplomat, the narrative; and one Ferdinand Rudolph Hassler, the astronomical and mapmaking portions of the contemplated publications. However, Conrad went into bankruptcy; Barton died without having performed any material part of the work; Hassler gave up in despair and abandoned the duties assigned to him; and Biddle was the only one to complete any portion of the planned publications in that, as stated, he published a history of the Expedition in two volumes. Apparently there had been deposited with Dr. Barton and Biddle much material which never was published and this fact gave Jefferson much concern.

On January 1, 1816, Jefferson wrote to one Correa da Serra, who succeded Dr. Barton as Professor of Botany in the College of Philadelphia, stating, in part,

"The death of Dr. Barton revives my anxiety to recover the MS. journals of Capt Lewis, for the satisfaction of his family; and may at the same time facilitate it. he had promised me sacredly that he would see to it's restoration; and as you were so kind as to say you would attend to it on your return to Philadelphia, I now earnestly entreat your aid for this object. knowing nothing of what is doing, or intended to be done as to the publication of the papers respecting the natural history & geography of the country, you will oblige me by any information you can obtain on this subject. the right to these papers is in the government, as may be seen by the instructions to Capt Lewis. they were left in his hands that he might derive to himself the pecuniary benefits of their publication, on the presumption they would certainly be published. if that presumption is to fail, the government must reclaim them; and it is to put this object into an effective course that I wish for information what is doing, or likely to be done. I know I should have the concurrence of Genl. Clarke in this * * *." (Library of Congress Photostat Print, Gov. Ex. 15).

On April 26, 1816, Jefferson wrote Correada Serra again, stating,

"* * * Since you are so kind as to interest yourself for Capt. Lewis's papers, I will give you a full statement of them.

"1. ten or twelve such pocket volumes, Morocco bound, as that you describe, in which, in his own hand writing, he had journalised all occurrences, day by day, as he travelled."

Then Jefferson stated that these volumes must be in the possession of "the gentlemen who published his travels," apparently referring to Biddle and one Paul Allen, a Philadelphia newspaper writer who supervised the writing of Biddle's history of the Expedition. He then listed a classification of the remainder of the papers of Captain Lewis, as "2. Descriptions of animals and plants"; "3. Vocabularies"; "4. his observations of longitude and latitude"; "5. his Map." In referring to these designations, he makes the following statement:

"These constitute the whole. they are the property of the government, the fruits of the expedition undertaken at such expence of money and risk of valuable lives. they contain exactly the whole of the information which it was our object to obtain for the benefit of our own country and of the world. but we were willing to give to Lewis and Clarke whatever pecuniary benefits might be derived from the publication, and therefore left the papers in their hands, taking for granted that their interests would produce a speedy publication, which would be better if done under their direction. but the death of Capt. Lewis, the distance and occupations of General Clarke, and the bankruptcy of their bookseller, have retarded the publication, and rendered necessary that the government should attend to the reclamation & security of the papers. their recovery is now become an imperious duty. their safest deposit as fast as they can be collected, will be the Philosophical Society, who no doubt will be so kind as to receive and preserve them, subject to the orders of government; and their publication, once effected in any way, the originals will probably be left in the same deposit. as soon as I can learn their present situation, I will lay the matter before the government to take such order as they think proper. As to any claims of individuals to these papers, it is to be observed that, as being the property of the public, we are certain neither Lewis nor Clarke would undertake to convey away the right to them, and that they could not convey them, had they been capable of

intending it. yet no interest of that kind is meant to be disturbed, if the individual can give satisfactory assurance that he will promptly & properly publish them. otherwise they must be restored to the government; & the claimant left to settle with those on whom he has any claim. my interference will, I trust, be excused, not only from the portion which every citizen has in whatever is public, but from the peculiar part I have had in the design and execution of this expedition." (7 Thwaites 394-96).

It will be observed that Jefferson made no particular reference to Clark's papers in his letter to da Serra, and moreover, he takes pains to say regarding the class of documents mentioned. that · neither Lewis nor Clark would undertake to "convey away the right to them, * * *. yet no interest of that kind is meant to be disturbed, if the individual can give satisfactory assurance that he will promptly & properly publish them."

In Jefferson's letter to Clark under date of September 8, 1816, he again indicates his interest in the publication of the same papers and documents to which he referred in his letter to da Serra, in that he states to Clark:

"The travelling journal of Gov. Lewis and yourself having been published sometime ago, I had hoped to hear that something was doing with the astronomical observations, the geographical chart, the Indian vocabularies, and other papers not comprehended in the journal published. with a view to have these given to the public according to the original intention, I got a friend to apply for them to mr. Biddle, in whose hands I understood them to be, * * *. he said he could not deliver them even to the War Office, without an order from you. it is to sollicit this order that I now trouble you, * * *." (Library of Congress Photostat Print, Gov. Ex. 16).

Clark's reply to Jefferson under date of October 10, 1816, refers to the fact that the narrative of the Expedition had been published, and then he says, "but I have not been so fortunate as to precure a single volume, as yet." (7 Thwaites 397). In that letter he encloses an order on Mr. Biddle for the papers in his possession relating to "Astronomical Observations, the Geographical Charts, the Indian Vocabularies, and other papers not comprehended in the journal of Lewis & Clarks Travels laterly published, and the Specimins which were left in the possession of Doct. Barton—also the Traveling pocket Journals." (7 Thwaites 397-98). Whether Clark was directing the delivery of his own pocket journals is not clear. It is, however, fair to assume that he was referring to the ten or twelve pocket journals of Lewis which Jefferson referred to in his letter of April 26, 1816, to da Serra.

Reference also may be made to Jefferson's letter to one Peter S. Duponceau, a fellow member and corresponding secretary of the American Philosophical Society, under date of November 17, 1817. In this letter he states:

"Dear Sir: a part of the information of which the expedition of Lewis and Clarke was the object has been communicated to the world by the publication of their journal; but much & valuable matter remains yet uncommunicated. the correction of the longitudes of their map is essential to it's value; to which purpose their observations of the lunar distances are to be calculated & applied. the new subjects they discovred in the vegetable, animal & mineral departments are to be digested and made known. the numerous vocabularies they obtained of the Indian languages are to be collated and published. altho' the whole expense of the expedition was furnished by the public, and the information to be derived from it was theirs also, yet on the return of Messrs. Lewis & Clarke the government thought it just to leave to them any pecuniary benefit which might result from a publication of the papers, and sup-

posed indeed that this would secure the best form of publication. but the property in these papers still remained in the government for the benefit of their constituents. with the measures taken by Govr. Lewis for their publication, I was never acquainted. after his death Govr. Clarke put them, in the first instance, into the hands of the late Dr. Barton, from whom some of them passed to mr. Biddle, and some again, I believe, from him to mr. Allen. while the Ms. books of journals were in the hands of Dr. Barton, I wrote to him on behalf of Govr. Lewis's family requesting earnestly, that, as soon as these should be published, the originals might be returned, as the family wished to have them preserved. he promised in his answer that it should be faithfully done. after his death, I obtained, thro' the kind agency of mr. Correa, from mr[s]. Barton, three of those books, of which I knew there had been 10. or 12. having myself read them. these were all she could find. the rest therefore, I presume are in the hands of the other gentlemen. after the agency I had had, in effecting this expedition, I thought myself authorised, and indeed that it would be expected of me that I should follow up the subject, and endeavor to obtain it's fruits for the public. I wrote to Genl. Clarke therefore for authority to receive the original papers. he gave it in the letters to mr. Biddle and to myself, which I now inclose, as the custody of these papers belonged properly to the War-office, and that was vacant at the time, I have waited several months for it's being filled. but the office still remaining vacant, and my distance rendering any effectual measures by myself, impracticable, I ask the agency of your committee, within whose province I propose to place the matter, by making it the depository of the papers generally." (7 Thwaites 402).

The remaining letter of any significance in this regard to which reference may be made is dated January 27, 1818, and is from Clark to Biddle. He states, in part,

"The papers which were to be delivered to Mr. Jefferson were, if I recollect right chiefly, if not entirely confined to the scientific part of the journey. Of this, however, I am not certain, and you will therefore please to examine the order which I gave to Mr. Jefferson and conform to it strictly. The journal of Sergeant Ordway I must request you to send me by the first convenient opportunity.

"In giving up the papers to the Society agreeably to my order in favor of Mr. Jefferson, you will also stipulate with the officers of the Society that I or any agent of mine shall at all times, have the full use of the papers to be employed for any future edition of the work." (Gov. Ex. 64).

It may be noted that in the minutes of the American Philosophical Society of November 19, 1817, when it accepted the Lewis and Clark papers in trust, there is a recital that "The manuscript journals of Mr. Clark are still in Mr. Biddle's hands and also a Journal of a sergeant which Mr. Clark bought." (7 Thwaites 405). It was not until April 8, 1818, that the Society received the three Clark journals from Biddle. That appears from the minutes of the Society of that date (7 Thwaites 406) wherein it is recited that Biddle deposited 14 volumes of Lewis and Clark's pocket journals. Sergeant Ordway's journal apparently was not left with the Society.

The Court concludes that the historical background as disclosed by these letters and the minutes of the American Philosophical Society reveals persuasively, first, that the primary interest of President Jefferson, who had fostered the Expedition and issued the instructions to Lewis, was the timely publication of all pertinent data, both scientific and educational, remaining unpublished, so that the world would know what had been ac-

complished; second, Jefferson indicated that the Government did not intend to assert a claim to any scientific, cartographical recordings, and other similar data accumulated by Lewis and Clark unless those in possession thereof failed to publish such data for the enlightenment and education of the world; and third, the deposit of the Lewis and Clark papers and documents with the American Philosophical Society in trust on April 8, 1818, was arranged by Jefferson, then a private citizen, with the cooperation of Clark and Biddle.

Jefferson left the Presidency in 1809, but there undoubtedly is substance to the position that the Government was made a third-party beneficiary of the trust in view of the intended arrangement among all of the parties. The fact that three of Clark's journals were deposited with the Society in trust, however, is not necessarily indicative that Clark recognized that the Government had title to all of his data and papers acquired on the Expedition. His journals of the Expedition from Camp Dubois to the Mandans were in Biddle's possession, as well as Sergeant Ordway's journal, and undoubtedly a great deal of other data, when the latter published his history. Thwaites, in the introduction to Volume 1 of his edition of the original journals, expressed the opinion that Biddle probably had in his possession Gass' journal also, as well as the documents later known as the Clark-Voorhis collection when he wrote his narrative. Admittedly, Clark attempted to cooperate with Jefferson in gathering much of the material left with Biddle and Dr. Barton, particularly that which consisted of Lewis' work, so that such documents could be deposited with the Society in trust to insure their safekeeping and enable the Government, as well as himself, to utilize the material thus deposited for future use or publication. That he intended to retain exclusively for himself not only the rough notes in controversy, but no doubt much other material accumulated by him on the Expedition seems evident. For instance, his journals and diaries of this Expedi-

tion from April 7 to July 3, 1805, September 11 to December 31, 1805, January 30 to April 3, 1806, and April 4 to June 6, 1806, as well as sundry notes of various kinds such as a first draft of entries from April 16 to 21, 1806, were found in 1903 by Thwaites in what now is known as the Clark-Voorhis collection, all of which were then in the possession of Clark's descendants.

And as an observation with reference to the Government's interest in the large amount of material in the Lewis and Clark collection deposited with the American Philosophical Society, it may be noted that these documents slumbered in the vaults of the Society for some seventy-five years without the Government or anyone else having sufficient interest therein to publish any part of this vast amount of material for the benefit of the public for whom Jefferson was so much concerned. And although the Lewis and Clark documents left with the Society may be said to have reposed there for the benefit of the Government, there is no indication that the Government ever sought to avail itself as such third-party beneficiary of the trust by carrying out the dreams and ambitions of Jefferson with respect thereto. Moreover, there is no showing here that the Government ever has made any claim to the documents which were in possession of the Clark heirs in 1903 and later published in Thwaites' original journals of the Expedition. In any event, therefore, it seems abundantly clear that in 1816 and 1817 when Jefferson referred to the Government's proprietary interest in the unpublished journals and data of the Expedition in the hands of Biddle and the family of the late Dr. Barton, he had no reference to papers such as these rough notes of the Expedition proper, which in a more finished and readable form in three journals already had been made available for Biddle's publication and which journals later were deposited by Biddle with the Society.

The Hammond heirs were in possession of these notes in 1953, and every indication is that General Hammond and

his family had been in such possession for many, many years. The circumstances surrounding the manner in which they came into General Hammond's possession are unknown. The Government contends, however, that it is reasonable to assume that Clark had left these notes in the office of the St. Louis Superintendency, which later was known as the Central Agency, when he was either Indian agent or Governor of the Missouri Territory. That assumption may seem tenable, but of course it is entirely conjectural. Clark may have given, or disposed of them, to some other Indian agent who succeeded him or subsequently acted in that capacity. The Government has established herein that General Hammond, who had previously been appointed Dakota Superintendent of Indian Affairs at Yankton, South Dakota, was instructed to close, and did close, the Central Superintendency at Lawrence, Kansas, in 1878. It adduces that these notes had been left by Clark at the St. Louis Superintendency and later removed as the locale of the agency changed. When General Hammond was ordered by the Government to close the Central Superintendency and take charge of the official books, papers, money and all property of that agency, he also was instructed to liquidate the office and to "examine, classify and arrange all books and papers."[3] It does appear that General Hammond took over the office at Lawrence and receipted for the books and other property of the Superintendency and shipped them to the Commissioner of Indian Affairs in Washington. He described this material as having been "accumulated at St. Louis, Atchison, Kansas, etc., etc., with the late Central Superintendency." Moreover, the Government points out that later there was found in the records of the Central Superintendency at the Bureau of Indian Affairs in Washington certain maps, including a map which Lewis and Clark probably had with them on their Expedition. And it appears that in the inventory which General Hammond sent to Washington there was included "one bundle of ancient maps." But the fact that one or more of these maps may have been with Clark on the Expedition is of no particular weight in establishing the Government's title to the res in question. The Government cannot contend successfully that it has any title to the notes in controversy merely because at some time they may have been left by Clark in some depository or desk available to him when he was the Indian agent at the St. Louis Superintendency. These notes had no relation to the affairs of the Agency. They were not made in connection with Clark's conduct of the Agency. If General Clark wilfully abandoned them, or forgot them, or turned them over to others at the Agency, such circumstances would not enhance the Government's claim of title if no title existed thereto when they were in Clark's possession. A span of 40 years had elapsed after Clark's death when General Hammond appeared at Lawrence, Kansas, to close the Central Superintendency. If he did obtain the notes there upon the assumption that Clark had abandoned them, the Hammond family retained them in their exclusive possession for some 75 years. And if these papers were found among the accumulated records of the Central Superintendency, it must be that General Clark had considered them as his own personal property—not as property belonging to the Government. It cannot be maintained that the personal property of an Indian agent of the United States becomes and forever remains government property because perchance it was kept by him at his official headquarters and left there for a period of years. The position of the Government in claiming title to these papers in controversy upon the assumption that General Hammond wrongfully abstracted them from the Lawrence, Kansas, office in 1878, is too tenuous and speculative to provide a basis for a factual finding of title in the Government.

3. The references to the directions to General Hammond to close the Agency at Lawrence, Kansas, and his responses in that regard are from the records of the Bureau of Indian Affairs.

It follows from the foregoing, which the Court adopts as its findings of fact, that the Court finds that the Government has not sustained the burden of proof in establishing its claim to the res in controversy. Therefore, its claim of a paramount title thereto cannot be, and is not, sustained. It is so ordered. Judgment may be entered accordingly. Exceptions are reserved.

Jurisdiction is reserved to enter any further order or orders which may be necessary in the premises, and to determine any untried issues herein which are within the jurisdiction of this Court.