UNITED STATES of America, Appellant,

v.

FIRST TRUST COMPANY OF SAINT PAUL, a Minnesota corporation, as Executor of the Last Will and Testament of Sophia V. H. Foster, Appellee,

and

Minnesota Historical Society, a Minnesota corporation; Ogden H. Hammond, as Executor of the Last Will and Testament of Sophia W. Hammond, deceased; Ogden H. Hammond and Clarence V. S. Mitchell, as trustees of a testamentary trust under said will for the benefit of Margaret Van S. H. Starr; Harriet K. Hammond; and John Doe and Mary Roe, whose true names are to plaintiff unknown, Appellees,

and

Elizabeth F. Vytlacil, Harriet F. Bunn and Roger Sherman Foster, Appellees.

No. 15744.

United States Court of Appeals
Eighth Circuit.
Jan. 23, 1958.

George Cochran Doub, Asst. Atty. Gen. (George E. MacKinnon, U. S. Atty., Melvin Richter, Samuel D. Slade and Marcus A. Rowden, Attys., Dept. of Justice, Washington, D. C., were with him on the brief), for appellant.

W. Dermot H. Stanley, New York City (McNeil V. Seymour, St. Paul, Minn., Donald F. Hyde and Frederic H. Poor, Jr., New York City, were with him on the brief), for appellees Ogden H. Hammond, as executor of the last will and testament of Sophia W. Hammond, deceased, and others.

David W. Raudenbush and Morgan, Raudenbush, Morgan, Oehler & Davis, St. Paul, Minn., submitted brief for appellee First Trust Co. of St. Paul, as executor of the last will and testament of Sophia V. H. Foster.

Before GARDNER, Chief Judge, and WOODROUGH and VOGEL, Circuit Judges.

VOGEL, Circuit Judge.

This action was commenced in Minnesota State District Court to quiet title to certain historical documents written in the main by William Clark, of the famed Lewis and Clark Expedition. The documents, herein referred to as the res, and whose whereabouts were unknown for approximately 150 years, were found in the attic of the St. Paul, Minnesota, home of a Mrs. Sophia V. H. Foster after her death in 1952. They were discovered in a desk formerly owned by General John Henry Hammond, Mrs. Foster's father, who died in 1890. The First Trust Company of St. Paul brought the action originally as executor of the last will and testament of Mrs. Foster, naming the Minnesota Historical Society, the then custodian of the papers, and certain descendant and collateral relatives of Mrs. Foster as defendants. Some of the individual defendants claimed interests in the res through the estate of Mrs. Foster's mother, Mrs. Sophia W. Hammond. The remaining individual defendants claim interests in the res directly through Mrs. Foster's estate. The Minnesota Historical Society was named a defendant because it could claim a lien on the res for labor expended by it in collating and transcribing the contents of the 67 documents comprising the res. This claim of lien was duly asserted in the Society's answer to the original complaint.

After due notice, the United States intervened in the action, claiming paramount title to the res as being a part of the work product of the Lewis and Clark Expedition. All of the parties agree that the res is a series of original writings on miscellaneous scraps of paper of various sizes and that they describe the Expedition's winter encampment at Camp Dubois, near the mouth of the Missouri River, within territorial United States in 1803-4 and a part of the Expedition's subsequent exploratory journey upon the Missouri River in 1804-5. The documents are almost entirely in the handwriting of Captain William Clark, second in command to Captain Meriwether Lewis.

The case was removed from the state court to the United States District Court for the District of Minnesota on motion of the United States. By order of the District Court, a separate trial was first had on the sole issue of the government's claim of paramount title to the res. In an erudite opinion and order, Chief Judge Nordbye, before whom the case was tried without a jury, held that the documents in question were rough notes of Captain Clark, made by him for his personal use in subsequently preparing his own private diary and hence were not an official work product of the Lewis and Clark Expedition to which the United States could claim paramount title. First Trust Co. of St. Paul v. Minnesota Historical Society, D.C.Minn., 1956, 146 F.Supp. 652. The United States has appealed to this court from the findings and judgment, making all of the original parties to this action appellees herein.

■ If Clark's notes are the written records of a government officer executed in the discharge of his official duties, they are public documents and ownership is in the United States. The government concedes that possession of the res by General Hammond and his heirs affords a presumption of ownership and that the burden of proof is upon the government to establish a superior title. Accordingly, if the government established that these were the written records of a public official made in the discharge of the duties of his office, the government should have prevailed. The court held that the government failed to carry its burden. Whether the District Court was clearly erroneous in so concluding is the only issue presented on this appeal. Other issues in the case await the outcome hereof.

The exact nature and historical significance of the documents involved and the probable circumstances by which they came into the possession of the original parties to this action are fully explained in Judge Nordbye's opinion. First Trust Co. of St. Paul v. Minnesota Historical Society, supra. It would be a needless duplication to attempt a complete redelineation of these numerous facts. They therefore will be referred to only to the extent necessary to reach a determination of this appeal.

On June 20, 1803, President Thomas Jefferson appointed Meriwether Lewis, an army captain on detached service, who was serving as Jefferson's secretary, to command an expedition, the object of which was " * * * to explore the Missouri river, & such principal stream of it, as, by it's course & communication with the waters of the Pacific Ocean, may offer the most direct & practicable water communication across this continent, for the purposes of commerce." Jefferson's letter to Lewis set forth in minute detail further objects of the mission and directed the making and preserving of a record of observations and notes covering numerous subjects set forth therein. He instructed, among other things:

"Your observations are to be taken with great pains & accuracy, to be entered distinctly, & intelligibly for others as well as yourself, to comprehend all the elements necessary, with the aid of the usual tables, to fix the latitude and longitude of the places at which they were taken, & are to be rendered to the war office, for the purpose of having the calculations made concurrently by proper persons within the U. S. several copies of

these, as well as your other notes, should be made at leisure times & put into the care of the most trustworthy of your attendants, to guard by multiplying them, against the accidental losses to which they will be exposed. a further guard would be that one of these copies be written on the paper of the birch, as less liable to injury from damp than common paper." (7 Thwaites 248.)

The instructions contain no reference to others in the party keeping an official record, diary or notes. Jefferson directed Lewis to designate someone to succeed him to the command in case of Lewis' death. Lewis' successor was to be "invested with all the powers & authorities given to yourself". Thereafter Lewis invited his friend William Clark to join him in the venture, wherefrom came the name now famous in American history as the Lewis and Clark Expedition. In addition to Lewis and Clark and Clark's negro slave, the Expedition was made up of three sergeants, one corporal and 28 enlisted men, all members of the army and subject to military discipline. That this was an official expedition of the Government of the United States there can be no doubt.

The Expedition's winter encampment at Camp Dubois extended from December 13, 1803, to May 14, 1804. During that period Clark kept rough notes pertaining to the activities of the members of the Expedition at Camp Dubois. Subsequent to the winter encampment, the Expedition moved up the Missouri River to the Mandan villages, near present Mandan and Bismarck, North Dakota, where it spent the winter of 1804–5. The Clark notes with which we are here concerned include those made at Camp Dubois and through the winter encampment at the Mandans until about April 3, 1805. His subsequent notes, now in private collections, are not involved herein. All of these notes were in the handwriting of Captain Clark, excepting a few lines in the handwriting of Captain Lewis and some three entries by unidentified persons. It is probable that during the winter encampment of 1804 and 1805 at the Mandans Clark transcribed the rough notes, ownership of which is in question here, into what Lewis referred to as "Capt. Clark's private journal". Lewis wrote to President Jefferson on April 7, 1805, and among other things stated:

"You will also receive herewith inclosed a part of Capt. Clark's private journal, the other part you will find inclosed in a separate tin box. this journal (is in it's original state, and of course incorrect, but it) will serve to give you the daily detales of our progress, and transactions. (Capt. Clark does not wish this journal exposed in it's present state, but has no objection, that one or more copies of it be made by some confidential person under your direction, correcting it's gramatical errors &c. indeed it is the wish of both of us, that two of those copies should be made, if convenient, and retained untill our return; in this state there is no objection to your submitting them to the perusal of the heads of the departments, or such others as you may think proper. a copy of this journal will assist me in compiling my own for publication after my return.) I shall dispatch a canoe with three, perhaps four persons, from the extreem navigable point of the Missouri, or the portage between this river, and the Columbia river, as either may first happen; by the return of this canoe, I shal send you my journal, and some one or two of the best of those kept by my men. I have sent a journal kept by one of the Sergeants, to Capt. Stoddard, my agent at St. Louis, in order as much as possible to multiply the chances of saving something. we have encouraged our men to keep journals, and seven of them do so, to whom in this respect we give every assistance in our power." (7 Thwaites 318–19.)

The record indicates that Captain Lewis, as the leader of the Expedition, was keeping a record, apparently in ac-

cordance with Jefferson's instruction. Clark's notation in his diary of April 2, 1805, refers to the fact that they were writing and preparing dispatches all day.

An examination of the 67 documents in question here indicates that while they do contain much data such as Jefferson requested Lewis to gather in his official record, they also carry a great many personal and private notations, including information about the receipt of newspapers or letters, details of personal illnesses, social engagements, and other such items as might not be expected to be found in notes of an official character or in an official record. Judge Nordbye found, at page 660 of 146 F.Supp.:

"Clark's rough notes, with the exception of some daily entries made by Lewis and the incidental writings of others therein, are the efforts of a frontier-educated man to keep notes of the daily occurrences of the Expedition. And when Clark sent his journal or journals to the President at Lewis' request, it seems quite obvious that they were furnished to him for his own perusal and not as official documents of the Expedition. It was expected that in due time Lewis' journal for that period would be completed."

The trial court pointed out that a number of other members of the Expedition kept personal diaries or notes and observations and that the government made no claim to them whatsoever. Clark bought Sergeant Ordway's journal when publication of the Lewis and Clark Expedition papers and documents was being furthered by him. The District Court found, 146 F.Supp. 652, 667:

"That he [Clark] intended to retain exclusively for himself not only the rough notes in controversy, but no doubt much other material accumulated by him on the Expedition seems evident. For instance, his journals and diaries of this Expedition from April 7 to July 3, 1805, September 11 to December 31, 1805, January 30 to April 3, 1806, and April 4 to June 6, 1806, as well as sundry notes of various kinds such as a first draft of entries from April 16 to 21, 1806, were found in 1903 by Thwaites in what now is known as the Clark-Voorhis Collection, all of which were then in the possession of Clark's descendants."

The District Court concluded that the documents in question were the private and personal writings of Captain Clark, unofficial in character and therefore not the work product of a government representative engaged in the performance of his duties.

As stated, the appeal here raises only one question: Was the trial court clearly erroneous in finding that the papers were written for Captain Clark's private use only and that accordingly the government had not sustained the burden of proof establishing its claim to them? Whatever view this court might take of the ownership of the Clark papers is not material to our decision in this case. We may not substitute our judgment for that of the finder of the facts. Rule 52(a) F.R.Civ.P., 28 U.S.C.A. The view of this court on the applicability of Rule 52(a) in nonjury or jury-waived cases is summarized in Commercial Standard Ins. Co. v. Maryland Cas. Co., 8 Cir., 1957, 248 F.2d 412, 416:

"'In a nonjury case, this Court may not set aside a finding of fact of a trial court unless there is no substantial evidence to sustain it, unless it is against the clear weight of the evidence, or unless it was induced by an erroneous view of the law.' Pendergrass v. New York Life Ins. Co., 8 Cir.; 1950, 181 F.2d 136, 137; Cleo Syrup Corp. v. Coca-Cola, 8 Cir., 1943, 139 F.2d 416, 417, 418, 150 A.L.R. 1056, certiorari denied 1944, 321 U.S. 781, 64 S.Ct. 638, 88 L.Ed. 1074. See United States v. Springfield Fire & Marine Ins. Co., 8 Cir., 1953, 207 F.2d 935. See also Wright, The Doubtful Omniscience of Appellate Courts, 41 Minn.L.Rev. 751, 771 (1957)."

We think that without additional reference it has already been demonstrated that Judge Nordbye's conclusion as to the privacy of the Clark papers is based upon substantial evidence. It is patent from the record that Lewis thought the Clark "journals", which may have been made from the rough notes in question here or may have been the notes themselves, were "private" and in sending them to President Jefferson gave him instructions as to limitations on their use which the President observed. Apparently then not only Clark himself but Lewis and Jefferson believed the papers to be the personal property of Captain Clark. In addition thereto, the character of the documents themselves, viewed in light of the fact that Captain Lewis, head of the Expedition, was making an official record, lend credence to the trial court's view that they were private as opposed to official records.

There is some indication here that General Hammond, in whose desk the papers apparently remained for at least 60 years, and probably much longer, might have obtained them from the office of an Indian Agency with which Clark had at one time been connected, and the government argues that it, then, " * * had a right to possession superior to that of the Hammonds who, it bears repeating, are unrelated and complete strangers to Clark." The trial court very properly held:

> "The position of the Government in claiming title to these papers in controversy upon the assumption that General Hammond wrongfully abstracted them from the Lawrence, Kansas, office in 1878, is too tenuous and speculative to provide a basis for a factual finding of title in the Government."

We find that the conclusions of the trial court are based on substantial evidence, are not against the clear weight of the evidence, and were not induced by an erroneous view of the law.

Affirmed.