## Case No. 4,901.

FOLSOM et al. v. MARSH et al.

[2 Story, 100;[1] 6 Hunt, Mer. Mag. 175.]

Circuit Court, D. Massachusetts. Oct. Term, 1841.

[1] [Reported by William W. Story, Esq.]

STORY, Circuit Justice. This is one of those intricate and embarrassing questions, arising in the administration of civil justice, in which it is not, from the peculiar nature and character of the controversy, easy to arrive at any satisfactory conclusion, or to lay down any general principles applicable to all cases. Patents and copyrights approach, nearer than any other class of cases belonging to forensic discussions, to what may be called the metaphysics of the law, where the distinctions are, ·or at least may be, very subtile and refined, and, sometimes, almost evanescent. In many cases, indeed, what constitutes an infringement of a patented invention, is sufficiently clear and obvious, and stands upon broad and general agreements and differences; but, in other cases, the lines approach very near to each other, and, sometimes, become almost evanescent. or melt into each other. So, in cases of copyright, it is often exceedingly obvious, that the whole substance of one work has been copied from another, with slight omissions and formal differences only, which can be treated in no other way than as studied evasions; whereas, in other cases, the identity of the two works in substance, and the question of piracy, often depend upon a nice balance of the comparative use made in one of the materials of the other; the nature, extent, and value of the materials thus used; the objects of each work; and the degree to which each writer may be fairly presumed to have resorted to the same common sources of information, or to have exercised the same common diligence in the selection and arrangement of the materials. Thus, for example, no one can doubt that a reviewer may fairly cite largely from the original work, if his design be really and truly to use the passages for the purposes of fair and reasonable criticism. On the other hand, it is as clear, that if he thus cites the

most important parts of the work, with a view, not to criticise, but to supersede the use of the original work, and substitute the review for it, such a use will be deemed in law a piracy. A wide, interval might, of course, exist between these two extremes, calling for great caution and involving great difficulty, where the court is approaching the dividing middle line which separates the one from the other. So, it has been decided that a fair and bonâ fide abridgment of an original work, is not a piracy of the copyright of the author. See Dodsley v. Kinnersley, 1 Amb. 403; Whittingham v. Wooler, 2 Swanst. 428, 430, 431, note; Tonson v. Walker, 3 Swanst. 672–679, 681. But, then, what constitutes a fair and bonâ fide abridgment, in the sense of the law, is one of the most difficult points, under particular circumstances, which can well arise for judicial discussion. It is clear, that a mere selection, or different arrangement of parts of the original work, so as to bring the work into a smaller compass, will not be held to be such an abridgment. There must be real, substantial condensation of the materials, and intellectual labor and judgment bestowed thereon; and not merely the facile use of the scissors; or extracts of the essential parts, constituting the chief value of the original work. See Gyles v. Wilcox, 2 Atk. 141.

In the present case, the work alleged to be pirated, is the Writings of President Washington, in twelve volumes, royal octavo, containing nearly seven thousand pages, of which the first volume contains a life of Washington, by the learned editor, Mr. Sparks, in respect to which no piracy is asserted or proved. The other eleven volumes consist of the letters of Washington, private and official, and his messages and other public acts, with explanatory notes and occasional illustrations by the editor. That the original work is of very great, and, I may almost say, of inestimable value, as the repository of the thoughts and opinions of that great man, no one pretends to doubt. The work of the defendants is in two volumes, duodecimo, containing eight hundred and sixty-six pages. It consists of a Life of Washington, written by the learned defendant, (the Rev. Charles W. Upham), which is formed upon a plan different from that of Mr. Sparks, and in which Washington is made mainly to tell the story of his own life, by inserting therein his letters and his messages, and other written documents, with such connecting lines in the narrative, as may illustrate and explain the times and circumstances, and occasions of writing them. Now, as I have already said, there is no complaint, that Mr. Upham has taken his narrative part, substantially, from the Life by Mr. Sparks. The gravamen is, that he has used the letters of Washington, and inserted, verbatim, copies thereof from the collection of Mr. Sparks. The master finds, by his report, that the whole number of

pages in Mr. Upham's work, corresponding and identical with the passages in Mr. Sparks's work, are three hundred and fifty-three pages out of eight hundred and sixty-six, a fraction more than one third of the two volumes of the defendants. Of these three hundred and fifty-three pages, the report finds that three hundred and nineteen pages consist of letters of Washington, which have been taken from Mr. Sparks's work, and have never been published before; namely, sixty-four pages are official letters and documents, and two hundred and fifty-five pages are private letters of Washington. The question, therefore, upon this admitted state of the facts, resolves itself into the point, whether such a use, in the defendants' work, of the letters of Washington, constitutes a piracy of the work of Mr. Sparks.

It is objected, in the first place, on behalf of the defendants, that the letters of Washington are not, in the sense of the law, proper subjects of copyright, for several reasons: (1) Because they are the manuscripts of a deceased person, not injured by the publication thereof; (2) because they are not literary compositions, and, therefore, not susceptible of being literary property, nor esteemed of value by the author; (3) because they are, in their nature and character, either public or official letters, or private letters of business; and (4) because they were designed by the author for public use, and not for copyright, or private property. Now, in relation to the last objection, it is most manifest, that President Washington deemed them his own private property, and bequeathed them to his nephew, the late Mr. Justice Washington, through whom the late Mr. Chief Justice Marshall and Mr. Sparks acquired an interest therein; and, as appears from the contract between these gentlemen, annexed to the report, the publication of these writings was undertaken by Mr. Sparks, as editor, for their joint benefit; and the work itself has been accomplished at great expense and labor, and after great intellectual efforts, and very patient and comprehensive researches, both at home and abroad. The publication of the defendants, therefore, to some extent, must be injurious to the rights of property of the representatives and assignees of President Washington. Indeed, as we shall presently see, congress have actually purchased these very letters and manuscripts, at a great price, for the benefit of the nation, from their owner and possessor under the will of Mr. Justice Washington, as private and most valuable property. That President Washington, therefore, intended them exclusively for public use, as a donation to the public, or did not esteem them of value as his own private property, appears to me to be a proposition, completely disproved by the evidence. Unless, indeed, there be a most unequivocal dedication of private letters and papers by the

author, either to the public, or to some private person, I hold, that the author·has a property therein, and that the copyright thereof exclusively belongs ·to him. Then as to the supposed distinction between letters of business, or of a mere private or domestic character, ˙and letters, which, from their character and contents, are to be treated as literary compositions, I am not prepared to admit its soundness or propriety. It is extremely difficult to say, what letters are or are not literary compositions. In one sense, all letters are literary, for they consist of the thoughts and language of the writer reduced to written characters, and show his style and his mode of constructing sentences, and his habits of composition. Many letters of business also embrace critical remarks and expressions of opinion on various subjects, moral, religious, political and literary. What is to be done in such cases? Even in compositions confessedly literary, the author may not intend, nay, often does not intend them for publication; and·yet, no one on that account doubts his right of property therein, as a subject of value to himself and to his posterity. If subsequently published by his representatives, would they not have a copyright therein? It is highly probable, that neither Lord Chesterfield, nor Lord Orford, nor the poet Gray, nor Cowper, nor Lady Russell, nor Lady Montague, ever intended their letters for publication as literary compositions, although they abound with striking ·remarks, and elegant sketches, and sometimes with the most profound, as well as affecting, exhibitions of close reflection, and various knowledge and experience, mixed up with matters of business, personal anecdote, and family gossip.

There is no small confusion in the books, in reference to the question of copyright in letters. Some of the dicta seem to suppose that no copyright can exist, except in letters which are professedly literary; while others again recognize a much more enlarged and liberal doctrine. See Gods. Pat. (Ed. 1840, London) pp. 327–332; Gee v. Pritchard, 2 Swanst. 403, 405, 426, 427; Perceval v. Phipps, 2 Ves. & B. 19, 24, 25, 28. Without attempting to reconcile, or even to comment upon the language of the authorities on this head, I wish to state what I conceive to be the true doctrine upon the whole subject. In the first place, I hold, that the author of any letter or letters, (and his representatives,) whether they are literary compositions, or familiar letters, or letters of business, possess the sole and exclusive copyright therein; and that no persons, neither those to whom they are addressed, nor other persons, have any right or authority to publish the same upon their own account, or for their own benefit. But, consistently with this right, the persons to whom they are addressed, may have, nay, must, by implication, possess, the right to publish any letter or letters addressed to them, upon such occasions, as require, or justify, the publication or public use of them; but this right is strictly limited to such occasions. Gee v. Pritchard, 2 Swanst. 415, 419. Thus, a person may justifiably use and publish, in a suit at law or in equity, such letter or letters as are necessary and proper, to establish his right to maintain the suit, or defend the same. So, if he be aspersed or misrepresented by the writer, or accused of improper conduct, in a public manner, he may publish such parts of such letter or letters, but no more, as may be necessary to vindicate his character and reputation, or free him from unjust obloquy and reproach. If he attempt to publish such letter or letters on other occasions, not justifiable, a court of equity will prevent the publication by an injunction, as a breach of private confidence or contract, or of the rights of the author; and a fortiori, if he attempt to publish them for profit; for then it is not a mere breach of confidence or contract, but it is a violation of the exclusive copyright of the writer. In short, the person, to whom letters ·are addressed, has but a limited right, or special property, (if I may so call it), in such letters, as a trustee, or bailee, for particular purposes, either of information or of protection, or of support of his own rights and character. The general property, and the general rights incident to property, belong to the writer, whether the letters are literary compositions, or familiar letters, or details of facts, or letters of business. The general property in the manuscripts remains in the writer and his representatives, as well as the general copyright. A fortiori, third persons, standing in no privity with either party, are not entitled to publish them, to subserve their own private purposes of interest, or curiosity, or passion. If the case of Perceval v. Phipps, 2 Ves. & B. 21, 28, before the then vice chancellor (Sir Thomas Plumer), contains a different doctrine, all I can say is, that I do not accede to its authority; and I fall back upon the more intelligible and reasonable doctrine of Lord Hardwicke, in Pope v. Curl, 2 Atk. 342, and Lord Apsley, in the case of Thompson v. Stanhope, Amb. 737, and of Lord Keeper Henley, in the case of Duke of Queensberry v. Sheffeare, 2 Eden, 329 (cited 4 Burrows, 2329), which Lord Eldon has not scrupled to hold to be binding authorities upon the point in Gee v. Pritchard, 2 Swanst. 403, 414, 415, 419, 426, 427. But I do not understand that Sir Thomas Plumer did, in Perceval v. Phipps, deny the right of property of the writer in his own letters; and so he was understood by Lord Eldon in Gee v. Pritchard; who, however, said, that that case admitted of much remark. Indeed, if the doctrine were otherwise, that no person, or his representatives, could have a copyright in his own private or familiar letters, written to friends, upon interesting political and other occasions,

or containing details of facts and occurrences, passing before the writer, it would operate as a great discouragement upon the collection and preservation thereof; and the materials of history would become far more scanty, than they otherwise would be. What descendant, or representative of the deceased author, would undertake to publish, at his own risk and expense, any such papers; and what editor would be willing to employ his own learning, and judgment, and researches, in illustrating such works, if, the moment they were successful, and possessed the substantial patronage of the public, a rival bookseller might republish them, either in the same, or in a cheaper form, and thus either share with him, or take from him the whole profits? It is the supposed exclusive copyright in such writings, which now encourages their publication thereof, from time to time, after the author has passed to the grave. To this we owe, not merely, the publication of the writings of Washington, but of Franklin, and Jay, and Jefferson and Madison, and other distinguished statesmen of our own country. It appears to me, that the copyright act of 1831, c. 16, § 9, [4 Stat. 436], fully recognizes the doctrine for which I contend. It gives by implication to the author, or legal proprietor of any manuscript whatever, the sole right to print and publish the same, and expressly authorizes the courts of equity of the United States to grant injunctions to restrain the publication thereof, by any person or persons, without his consent.

In respect to official letters, addressed to the government, or any of its departments, by public officers, so far as the right of the government extends, from principles of public policy, to withhold them from publication, or to give them publicity, there may be a just ground of distinction. It may be doubtful, whether any public officer is at liberty to publish them, at least, in the same age, when secrecy may be required by the public exigencies, without the sanction of the government. On the other hand, from the nature of the public service, or the character of the documents, embracing historical, military, or diplomatic information, it may be the right, and even the duty, of the government, to give them publicity, even against the will of the writers. But this is an exception in favor of the government, and stands upon principles allied to, or nearly similar to, the rights of private individuals, to whom letters are addressed by their agents, to use them, and publish them, upon fit and justifiable occasions. But assuming the right of the government to publish such official letters and papers, under its own sanction, and for public purposes, I am not prepared to admit, that any private persons have a right to publish the same letters and papers, without the sanction of the government, for their own private profit and advantage. Recently the Duke of Wellington's despatches have (I believe) been published,

by an able editor, with the consent of the noble duke, and under the sanction of the government. It would be a strange thing to say, that a compilation involving so much expense, and so much labor to the editor, in collecting and arranging the materials, might be pirated and republished by another bookseller, perhaps to the ruin of the original publisher and editor. Before my mind arrives at such a conclusion, I must have clear and positive lights to guide my judgment, or to bind me in point of authority. However, it is not necessary, in this case, to dispose of this point, because, of the letters and documents published by the defendants, not more than one fifth part are of an official character.

Another and distinct objection urged on behalf of the defendants, is, that congress have purchased the manuscripts of these letters and documents, and they have become public property, and may be published by any one. An answer, in part, has been already given to this objection. Congress have, indeed, authorized the purchase of these manuscripts from the owner and possessor thereof, and paid the liberal price of 25,000 dollars therefor; and they have thus become national property. But it is an entirely inadmissible conclusion that, therefore, every private person has a right to use them, and publish them. It might be contended, with as much force and correctness, that every private person had an equal right to use any other national property at his pleasure, such as the arms, the ammunition, the ships, or the custom houses, belonging to the government. But a reason, which is entirely conclusive upon this point, is, that the government purchased the manuscripts, subject to the copyright already acquired by the plaintiffs in the publication thereof. The vendor took them subject to that copyright, and could convey no title which he did not himself possess, or beyond what he possessed. Nor is there any pretence to say that he either did convey, or intended to convey, to the government, the property in these manuscripts, except subject to the copyright already acquired.

The next and leading objection is, that the defendants had a right to abridge and select, and use the materials which they have taken for their work, which, though it embraces the number of letters above stated, is an original and new work, and that it constitutes, in no just sense, a piracy of the work of the plaintiffs. This, in truth, is the real hinge of the whole controversy, and involves the entire merits of the suit. It is certainly true, that the defendants' work cannot properly be treated as an abridgment of that of the plaintiffs; neither is it strictly and wholly a mere compilation from the latter. So far as the narrative goes, it is either original, or derived (at least as far as the matter has been brought before the court) from common sources of information, open to all au-

-thors. It is not even of the nature of a collection of beauties of an author; for it does not profess to give fugitive extracts, or brilliant passages from particular letters. It is a selection of the entire contents of particular letters, from the whole collection or mass of letters of the work of the plaintiffs. From the known taste and ability of Mr. Upham, it cannot be doubted, that these letters are the most instructive, useful and interesting to be found in that large collection.

The question, then, is, whether this is a justifiable use of the original materials, such as the law recognizes as no infringement of the copyright of the plaintiffs. It is said, that the defendant has selected only such materials, as suited his own limited purpose as a biographer. That is, doubtless, true; and he has produced an exceedingly valuable book. But that is no answer to the difficulty. It is certainly not necessary, to constitute an invasion of copyright, that the whole of a work should be copied, or even a large portion of it, in form or in substance. If so much is taken, that the value of the original is sensibly diminished, or the labors of the original author are substantially to an injurious extent appropriated by another, that is sufficient, in point of law, to constitute a piracy pro tanto. The entirety of the copyright is the property of the author; and it is no defence, that another person has appropriated a part, and not the whole, of any property. Neither does it necessarily depend upon the quantity taken, whether it is an infringement of the copyright or not. It is often affected by other considerations, the value of the materials taken, and the importance of it to the sale of the original work. Lord Cottenham, in the recent cases of Bramwell v. Halcomb, 3 Mylne & C. 737, 738, and Saunders v. Smith, Id. 711, 736, 737, adverting to this point, said: "When it comes to a question of quantity, it must be very vague. One writer might take all the vital part of another's book, though it might be but a small proportion of the book in quantity. It is not only quantity, but value, that is always looked to. It is useless to refer to any particular cases, as to quantity." In short, we must often, in deciding questions of this sort, look to the nature and objects of the selections made, the quantity and value of the materials used, and the degree in which the use may prejudice the sale, or diminish the profits, or supersede the objects, of the original work. Many mixed ingredients enter into the discussion of such questions. In some cases, a considerable portion of the materials of the original work may be fused, if I may use such an expression, into another work, so as to be undistinguishable in the mass of the latter, which has other professed and obvious objects, and cannot fairly be treated as a piracy; or they may be inserted as a sort of distinct and mosaic work, into the general texture of the second work, and constitute the peculiar

excellence thereof, and then it may be a clear piracy. If a person should, under color of publishing "Elegant Extracts" of poetry, include all the best pieces at large of a favorite poet, whose volume was secured by a copyright, it would be difficult to say why it was not an invasion of that right, since it might constitute the entire value of the volume. The case of Mawman v. Tegg, 2 Russ. 385, is to this purpose. There was no pretence in that case, that all the articles of the encyclopedia of the plaintiffs had been copied into that of the defendants; but large portions of the materials of the plaintiffs' work had been copied. Lord Eldon, upon that occasion, held, that there might be a piracy of part of a work, which would entitle the plaintiffs to a full remedy and relief in equity. In prior cases, he had affirmed the like doctrine. In Wilkins v. Aikin, 17 Ves. 422, 424, he said: "There is no doubt, that a man cannot, under the pretence of quotation, publish either the whole or a part of another's book, though he may use, what in all cases it is difficult to define, fair quotation." In Roworth v. Wilkes, 1 Camp. 94, Lord Ellenborough said: "A review will not, in general, serve as a substitute for the book reviewed; and even there, if so much is extracted, that it communicates the same knowledge with the original work, it is an actionable violation of literary property. The intention to pirate is not necessary in an action of this sort; it is enough, that the publication complained of is in substance a copy, whereby a work vested in another is prejudiced. A compilation of this kind (an encyclopedia) may differ from a treatise published by itself; but there must be certain limits fixed to its transcripts; it must not be allowed to sweep up all modern works, or an encyclopedia would be a recipe for completely breaking down literary property." The vice chancellor (Sir L. Shadwell), in Sweet v. Shaw, 1 Jur. (London) 212 [3 Jur. 217], referring to the remarks of Lord Ellenborough, cited by counsel, said: "That does not mean a substitute for the whole work. From what you state, suppose a book to contain one hundred articles, and ninety-nine were taken, still it would not be a substitute." And in this very case he granted an injunction, being of opinion, that there was prima facie, at law, an invasion of the plaintiffs' right; not only an injury, but also a damage to the plaintiffs, in copying from several volumes of Reports, published by the plaintiffs, although eleven only had been copied verbatim, but a considerable number of what were called "abridged cases," were, in truth, copies of the plaintiffs' volumes, with little, or trifling, alterations. It is manifest, also, from what fell from Lord Chancellor Cottenham, in Saunders v. Smith, 3 Mylne & C. 711, that he entertained no doubt, (although he did not decide the point,) that there might be a violation of the copyright of volumes of Reports, by copying

verbatim a part only of the cases reported. Much must, in such cases, depend upon the nature of the new work, the value and extent of the copies, and the degree in which the original authors may be injured thereby. In Lewis v. Fullarton, 2 Jur. (London) 127 [3 Jur. 669], 2 Beav. 6, Lord Langdale, in the case of a topographical dictionary, held, that largely copying from the work in another book having a similar object, was a violation of that copyright, although the same information might have been (but, in fact, was not) obtained from common sources, open to all persons. On that occasion, he said: "None are entitled to save themselves trouble and expense, by availing themselves, for their own profit, of other men's works, still entitled to the protection of copyright;" and, accordingly, in that case, he granted an injunction as to the parts pirated, although it was admitted, on all hands, that there was much which was original in the new work.

In the present case, I have no doubt whatever, that there is an invasion of the plaintiffs' copyright; I do not say designedly, or from bad intentions; on the contrary, I entertain no doubt, that it was deemed a perfectly lawful and justifiable use of the plaintiffs' work. But if the defendants may take three hundred and nineteen letters, included in the plaintiffs' copyright, and exclusively belonging to them, there is no reason why another bookseller may not take other five hundred letters, and a third, one thousand letters, and so on, and thereby the plaintiffs' copyright be totally destroyed. Besides; every one must see, that the work of the defendants is mainly founded upon these letters, constituting more than one third of their work, and imparting to it its greatest, nay, its essential value. Without those letters, in its present form the work must fall to the ground. It is not a case, where abbreviated or select passages are taken from particular letters; but the entire letters are taken, and those of most interest and value to the public, as illustrating the life, the acts, and the character of Washington. It seems to me, therefore, that it is a clear invasion of the right of property of the plaintiffs, if the copying of parts of a work, not constituting a major part, can ever be a violation thereof; as upon principle and authority, I have no doubt it may be. If it had been the case of a fair and bona fide abridgment of the work of the plaintiffs, it might have admitted of a very different consideration.

I have come to this conclusion, not without some regret, that it may interfere, in some measure, with the very meritorious labors of the defendants, in their great undertaking of a series of works adapted to school libraries. But a judge is entitled in this case, as in others, only to know and to act upon his duty. I hope, however, that some means may be found, to produce an amicable settlement of this unhappy controversy. The report of the master must stand confirmed, and a perpetual injunction be awarded, restraining the defendants, their agents, servants and salesmen, from farther printing, publishing, selling, or disposing of any copy or copies of the work complained of; the "Life of Washington," by the Rev. Charles W. Upham, containing any of the three hundred and nineteen letters of Washington, stated in the report of the master, and never before published; and that it be referred to a master, to take an account of the profits made by the defendants, in the premises; with leave for either party to apply to the court for farther directions.