**M. B. SCHNAPPER, Public Affairs Press (A corporation of the State of Delaware), Appellants,**

v.

**William E. FOLEY, Director, Administrative Office of the U.S. Courts of the Supreme Court, et al.**

**No. 79–1848.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 27, 1981.

Decided Oct. 1, 1981.

Certiorari Denied Feb. 22, 1982. See 102 S.Ct. 1448.

Eric Schnapper, New York City, with whom Seymour S. Guthman and George R. Douglas, Jr., Washington, D. C., were on the brief for appellants.

Thomas J. Byrnes, Atty., Dept. of Justice, Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty. and Alice Daniel, Asst. Atty. Gen., Washington, D. C., were on the brief for appellees, Foley and Ringer.

Theodore D. Frank, Washington, D. C., with whom Mania K. Baghdadi, Elizabeth L. Shriver and Eric H. Smith, Washington, D. C., were on the brief, for appellees, Public Broadcasting Service, et al. Rodney F. Page, Washington, D. C., also entered an appearance for appellees, Public Broadcasting Service, et al.

Murray Drabkin, Washington, D. C., was on the brief for appellee, Metropolitan Pittsburgh Public Broadcasting, Inc.

Before ROBINSON, Chief Judge, McGOWAN, Senior Circuit Judge, and PARKER *, United States District Judge for the District of Columbia Circuit.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

Appellants M. B. Schnapper and the Public Affairs Press challenge the arrangements among government agencies and public broadcasters for the filming and dissemination of the television series "Equal Justice Under Law." Although the complaint states numerous legal grounds for relief, appellants' central contention is that one commissioned by the Government to create a literary or artistic work cannot obtain a copyright in that work. The District Court granted defendants' motion to dismiss. *Schnapper v. Foley*, 471 F.Supp. 426 (D.D.C.1979). For the reasons appearing below, we affirm.

I

The complaint names five defendants who, it is alleged, had some role in the series: William E. Foley, Director of the Administrative Office of the United States Courts (AO), the Register of Copyrights, then Barbara H. Ringer and now David Ladd, *seek* 46 Fed. Reg. 12,705 (1981); the

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

Public Broadcasting Service (PBS), Metropolitan Pittsburgh Public Broadcasting, Inc., the series' producer and proprietor of television station WQED, and Greater Washington Area Educational Telecommunications Association, Inc., which broadcast part of the series over its television station, WETA.

The complaint also alleges that the contract "required" WQED to copyright the films, and to assign such copyright to the Government. Complaint, ¶ 13. At oral argument and in later correspondence, both counsel for WQED and counsel for the federal appellees stated that, although WQED did copyright the films, there was never an assignment of the copyright to the Government, and counsel for appellants has not contested the point. According to a March 20, 1981 letter sent to appellants' counsel by counsel for the federal appellees, no government agency has any copyright interest in the films. However, for the purposes of this appeal from the District Court's dismissal of the complaint under Fed.R.Civ.P. 12(b)(6), we are constrained to regard the allegations of the complaint as true, and will proceed on the assumption that an assignment took place. 5 C. Wright & A. Miller, Federal Practice and Procedure § 1358 (1969).

To put this allegation in context, we take judicial notice of certain indisputable facts. *See* Fed.R.Evid. 201(b), (c). The series, commissioned by the Judicial Conference as a bicentennial project, dramatized four cases arising in the early years of the Republic that established constitutional law principles of enduring significance: *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803); *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819); *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824); and, in two parts, the trial of Aaron Burr. Swindler, Equal Justice Under Law, 63 A.B.A.J. 1099 (1977).

The stated goal of the project was to increase public understanding of the judicial process and to this end the films were broadcast over the PBS network in September of 1976. *Id.* The government agencies did exercise some supervision over the scripts, with a subcommittee from the judicial agencies involved reviewing the stories for "accuracy and authenticity." *Id.* at 1100.

The appellants further complain that the films were transmitted by PBS to its affiliates, including WETA, and by them broadcast without any disclosure of the government's control over their content. Complaint, ¶ 15. This, it is alleged, caused injury of an unspecified nature to the class of persons who watch WETA, a purported class whose interests appellant Schnapper states he is qualified to represent. *Id.,* ¶ 8. The nature of the injury is difficult to fathom because the class comprises not those who actually watched the programs, but anyone who ever viewed any of WETA's televised offerings, even those who never knew of the series at issue. *Id.*

In paragraph 16, the complaint asserts that the existence of the copyright severely hampers public access to the films because PBS, WQED, and the AO have refused to permit their commercial broadcast, thus injuring those who do not live within range of a public television station. Since appellant Schnapper had previously stated that he is not so situated, but rather a viewer of WETA, this purported denial of access has apparently not injured him. The injury of which appellants chiefly complain is that the copyright prevents them from publishing the text of the films. *Id.,* ¶ 17.

The complaint alleges that the defendants have violated the First and Fifth Amendments, the Property Clause, art. IV, sec. 3, and the Copyright Clause, art. 1, sec. 8 of the Constitution, as well as the new and old Copyright Acts, 17 U.S.C. § 105 (1976), 17 U.S.C. § 8 (1970), various portions of the Communications and Public Broadcasting Acts, and "the public policy of the United States." Complaint, ¶¶ 18–19, 25, 30. The complaint seeks both injunctive and declaratory relief not only to void the copyright subsisting in "Equal Justice Under Law" but also to prevent the defendants from committing in the future acts that appellants contend are unlawful.

The District Court granted the defendants' motion to dismiss, and therefore never ruled upon the legitimacy *vel non* of the purported classes. The court held that (1) injunctive relief was not available against the sovereign, (2) the copyright law allows the copyrighting of a work commissioned by the Government, (3) there is no danger of government censorship because the stations were under no compulsion to either produce or air these films, and (4) there is no conflict between the First Amendment and copyright. *Schnapper v. Foley*, 471 F.Supp. 426, 429 (D.D.C.1979).

At oral argument before this court, counsel for WQED expressed the opinion that the station would be willing to permit appellants to print the text of the films. Accordingly, on February 20, 1981, this court issued an order suspending consideration of the appeal for several weeks and stating in part that,

> ... it appearing that arguably the only significant injury in fact of which appellant Schnapper has complained was the alleged denial to him of commercial publication rights to the script ..., and it further appearing ... that the appellees ... would consider granting such rights, ... or had no control over them, and that counsel for all parties would promptly confer in order to explore the question of the possible availability to appellant of such rights.

The parties were unable to settle the controversy. Counsel for appellants requested WQED to waive any copyright or ownership claims it might assert not only against appellant but against any commercial television station seeking to broadcast the films. There being considerable difference between a license and a waiver of rights in a literary or artistic work, counsel for WQED stated that they had no intention of waiving its rights in "Equal Justice Under Law." After we were apprised that no settlement would be forthcoming, we were compelled to decide the legal issues of the

instant case, and we do so now by affirming the District Court with respect to each question presented save that of sovereign immunity.

## II

At the threshold,[1] we are confronted with the District Court's ruling that the United States and its officers, including officials of the Administrative Office of the United States Courts and the Register of Copyrights, are insulated from suit for injunctive relief by the doctrine of sovereign immunity. *Schnapper v. Foley*, 491 F.Supp. 426, 427 (D.D.C.1979). In support of this proposition the court cited *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

We do not think that the District Court's application of *Larson* to the instant case can be considered correct in light of the amendments to 5 U.S.C. §§ 702 & 703 made by P.L. 94–574, 90 Stat. 2721, 94th Cong., 2d Sess. (1976). That statute enacted into law this language:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States ...

5 U.S.C. § 702 (1976). The legislative history of this provision could not be more lucid. It states that this language was intended "to eliminate the defense of sovereign immunity with respect to any action in a court of the United States seeking relief other than money damages and based on the assertion of unlawful official action by a Federal officer ...." S. Rep. No. 996, 94th Cong., 2d Sess. at 2 (1976).

After reviewing *Larson* and other leading cases, the Senate Report concluded:

> The application of sovereign immunity is so illogical that one cannot predict in what case the injustice is likely to occur.

1. We treat other preliminary issues such as standing with reference to each of appellants' claims on the merits in Parts IV and V *infra*.

. . . .

. . .[T]he time [has] now come to eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity.

. . . .

[When the defense is raised,] the sovereign immunity doctrine distracts the court's attention from the basic issue concerning the availability or scope of judicial review and diverts it toward sophistry and semantics.

S. Rep. No. 996 at 7–8. The clarity and force of the legislative history leaves this court with no alternative but to conclude that all questions of the amenability of a federal officer to a suit for injunctive relief must be decided with reference to section 702, not *Larson. Accord, Sea-Land Service v. Alaska Railroad*, 659 F.2d 243 (D.C. Cir. 1981). And section 702 retains the defense of sovereign immunity only when another statute expressly or implicitly forecloses injunctive relief. The question is therefore whether each particular law appellants assert as a basis for their suit supplies a claim for injunctive relief, and we will discuss the question *infra* only when, with respect to a particular law, there is authority to support a negative answer.[2]

### III

The most plausible point of departure for considering appellants' claims on the merits lies in their assertion that the copyright laws, both old and new, do not permit the registration of works commissioned by the Government, or the subsequent assignment of copyrights subsisting therein to the Government. As the series was copyrighted in 1976 under the old Copyright Act, and appellants seek a broad injunction of future applicability under the new Act, we will decide the fate of appellants' claims with respect to both the old and new Copyright Acts.

■ The status of works produced pursuant to a Government commission does not present any difficult problems under the new Copyright Act. Section 105 of the new Act, 17 U.S.C. § 105 (Supp. I 1977) states in its entirety:

Copyright protection under this title is not available for any work of the United States Government, but the United States Government is not precluded from receiving and holding copyrights transferred to it by assignment, bequest, or otherwise.

The statute defines a "work of the United States" as one "prepared by . . . an employee of the United States Government as part of that person's official duties." 17 U.S.C. § 101 (Supp. I 1977). It is readily observable, therefore, that the language of the new Copyright Act does not prohibit copyright protection for federally commissioned works.

Whatever doubt there may be left after reading the statute is wholly dispelled by the legislative history, which states plainly that these commissioned works may be eligible for copyright protection:

The bill deliberately avoids making any sort of outright, unqualified prohibition against copyright in works prepared under Government contract or grant. There may well be cases where it would be in the public interest to deny copyright . . . . However, there are almost certainly many other cases where the denial of copyright protection would be unfair or

---

**2.** We may also doubt whether, even in the absence of section 702, the *Larson* case would prevent a court from awarding equitable relief on the basis of appellants' constitutional claims. The *Larson* Court was at some pains to note that injunctive relief against the sovereign could be obtained when the United States or an officer was found to have violated the Constitution:

. . . Under our constitutional system, certain rights are protected against governmental action and, if such rights are infringed by the actions of officers of the Government, it is proper that the courts have the power to grant relief against those actions. But in the absence of a claim of constitutional limitation, [courts may not enjoin the Government].

*Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 704, 69 S.Ct. 1457, 1468, 93 L.Ed. 1628 (1949).

would hamper the production and publication of important works.

H.R. Rep. No. 1476, 94th Cong., 2d Sess. 59 (1976), U.S.Code Cong. & Admin.News 1976, pp. 5659, 5672. That report also states that the government agency may withhold copyright protection from the author if it would be in the public interest to do so or if the commission is merely an alternative to producing the work in-house. *Id.; see also* 1 Nimmer on Copyright § 5.06[B][2] n.19.2. In this case, however, the government did not choose to withhold copyright protection from WQED.

Although section 105 explicitly allows the Government to obtain a copyright by assignment, appellants argue that section 105 does not comprehend an assignment of a federally commissioned work. They assert that this commission and assignment constitute an effort to avoid the proscription of copyright subsisting in works produced by the Government, and is therefore prohibited by the new law. In support of this analysis they cite the following passage of Professor Nimmer's treatise:

> Could the U.S. Government thus claim a copyright in a work by this indirect method which it would be precluded from claiming if the work were in the first instance made in a for hire relationship? It seems unlikely that the courts would permit such a subterfuge.

1 Nimmer on Copyright § 5.06[B][3].

■ Without laying down a broad rule, we are reluctant to cabin the discretion of government agencies to arrange ownership and publication rights with private contractors absent some reasonable showing of a congressional desire to do so. The legislative history noted above indicates a desire to vest the government with some flexibility in making these arrangements. The House Report provides no strong indicia of congressional intent that would lead this court to void the alleged assignment provision. It states, "The effect of section 105 is intended to place all works of the United States Government ... in the public domain." H.R. Rep. No. 1476, 94th Cong., 2d Sess. 59 (1976), U.S.Code Cong. & Admin.

News 1976, p. 5672. Works of the United States were defined by section 101 to comprise works created by Government employees carrying out their official duties. Section 105, therefore, is not necessarily subverted by assigning to the Government the copyright in a commissioned work that is neither produced by current or former employees nor related to the official duties of any Government employee, as here. Had the Government employees been detailed as consultants or employees of WQED, we might more readily find the purported assignment to be a "subterfuge," but without any such allegation we simply lack the statutory warrant to void the assignment.

■ The 1909 Act similarly provides no basis on which to deny copyright protection to a work commissioned by the Government or to void an alleged assignment of that work to the Government. Section 8 of the superseded Copyright Act states, in relevant part, "No copyright shall subsist ... in any publication of the United States Government." 17 U.S.C. § 8 (1970). The applicability of that language to commissioned works was an "ambiguous" issue, according to Professor Nimmer. 1 Nimmer on Copyright § 5.06[B][2] & n.19.

This court has had occasion to determine the general issue of the scope of the governmental exception of the old Copyright Act. *Public Affairs Associates v. Rickover*, 284 F.2d 262 (D.C.Cir. 1960), *vacated for insufficient record*, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962). That case was based upon an action for a declaratory judgment brought by Public Affairs Associates, Inc., doing business as Public Affairs Press, an appellant in the instant case, to establish its right to public Admiral Rickover's speeches without the Admiral's permission. *See* 284 F.2d at 264–65. In the course of holding that the speeches of a public official composed on his own time and not written as part of his official duties may be copyrighted by that official, this court read section 8

> ... to refer to publications commissioned or printed at the cost and direction of the United States. These would be authoriz-

ed expositions on matters of governmental interest by governmental authority. *Id.* at 268 (footnote omitted).

Appellants contend that this dictum supports their contention that federally commissioned works cannot be copyrighted under section 8. We think that the dictum is too vague to provide much guidance. A commissioned work, such as "Equal Justice Under Law," is not an exposition "by government authority," but by the creator. Therefore, it may be that the court's use of the word "commissioned" comprised only works privately printed or reproduced but created by government employees as part of their official duties or intended as statements of government policy.

Nor is the case of *DuPuy v. Post Telegram Co.*, 210 F. 883 (3d Cir. 1914), dispositive. While the Third Circuit held that no copyright could be had in a work (1) commissioned by the Government and (2) published as an official Government document, the court's *ratio decidendi* depended solely upon the latter quality: "This bulletin was a public official document, one which by its public character was by statute exempted from copyright appropriation." 210 F. at 884.

Finally, we do not receive much assistance from *United States v. First Trust Company*, 251 F.2d 686 (8th Cir. 1958). At issue was the ownership of certain notes prepared by Captain William Clark during the Lewis and Clark expedition of 1804–05. The Eighth Circuit posed the question it saw as decisive by stating: "If Clark's notes are the written records of a government officer executed in the discharge of his official duties, they are public documents and ownership is in the United States." 251 F.2d at 688. The court, having affirmed the District Court's finding that the notes were considered private, had no reason to ascertain whether Captain Clark had been commissioned to keep his diary by President Jefferson, Meriwether Lewis, or other government officials.

Our effort to interpret section 8 of the old Copyright Act, although not much advanced by the cases noted above, is greatly aided by a decision of this circuit holding that the legislative history of the 1976 Copyright Act may be used to interpret those provisions of the former Act that the new law was intended to reproduce. *Esquire, Inc. v. Ringer*, 591 F.2d 796, 802–03 (D.C.Cir. 1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979). The legislative history reveals that section 8 is one of those provisions. H.R. Rep. No. 1476, 94th Cong., 2d Sess. 58 (1976), U.S.Code Cong. & Admin.News 1976, p. 5659. Therefore, the explicit legislative intent to extend copyright protection to some Government-commissioned works can be taken as indicating that section 8 did not prohibit such an arrangement.

This has also been the consistent position of the Register of Copyrights, who is charged with administering the copyright laws through the Copyright Office. That agency had consistently accepted for registration federally commissioned works under the previous Copyright Act. *See* Berger, "Copyright in Government Publications," in *Copyright Law Revision: Studies Prepared for the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Judiciary Committee*, 86th Cong., 2d Sess. 33–34 (Comm. Print 1961). The *Esquire* court also stated that the Register's interpretation of the copyright laws, if consistently applied, is entitled to considerable weight. *Esquire, Inc. v. Ringer*, 591 F.2d 796, 801 (D.C.Cir. 1978), *cert. denied*, 449 U.S. 908, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979).

We also conclude that the alleged assignment to the Government was authorized under section 8. The provision of section 105 of the new law permitting the Government to receive a copyright by assignment was a confirmation of the existing rule announced in *Folsom v. Marsh*, 9 F.Cas. 342 (C.C.D.Mass.1841). 1 Nimmer on Copyright § 5.06[B][3]. Justice Story, sitting as a Circuit Justice, stated that when Congress acquired letters written by President Washington, it did not thereby place the letters in the public domain. He explained that "It might be contended, with as much force and correctness, that every private person

had an equal right to use any other national property at his pleasure, such as the arms, the ammunition, the ships, or the custom houses, belonging to the government." 9 F.Cas. at 347.[3] The rule of *Folsom*, its reaffirmation in the new law, and the practice of the Copyright Office in permitting copyright to exist after assignment in these circumstances, *see* Berger, *supra*, at 34, provide ample justification for our refusal to hold that section 8 prohibited the assignment of a copyright to the government.

Informing our consideration of the statutory issues is the contention advanced by WQED that limiting the right of public broadcasters to obtain copyrights in works produced with government funds would "cripple" public television, WQED Br. at 10. The federal government spends millions of dollars to finance public television programming, and we cannot understand how, were we to void the copyright in "Equal Justice Under Law," any program produced with federal funds could obtain a copyright. It is idle to state that the harm lies not in federal financing, but in federal "control" of content. Presumably a federal grant to televise *Hamlet* would be deemed an unlawful exercise of control over content if the Government indicated that it would not be satisfied by a production of *Macbeth*. If "control" is the Government's desire to get what it paid for, as here, we conceive that nothing but an unconditional grant to public broadcasting would pass the test of "control."

The public broadcasters seek copyright protection for federally commissioned works, they inform us, chiefly as a matter of economic self-interest, if not survival. We are told that the unions with which the broadcasters must negotiate would demand higher rates for production if the stations could not control subsequent commercial,

and thus revenue-producing, uses. *Id.* at 10–11. We are further informed that foreign and other sales of public television programs constitute a significant source of revenue to the producing stations, *id.* at 11. We infer that the loss of this revenue would lead to requests for more government money, fewer original programs, or both.

It is against this backdrop that we evaluate appellants' claims that if the old or new copyright acts purport to allow registration for copyright of federally commissioned works, or its assignment to the government, those acts were beyond the power of the Congress to enact into law. The constitutional grant of power to Congress to pass legislation with respect to copyrights is contained in the Copyright Clause, art. I, sec. 8: "To promote the Progress of Science and the useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." The appellants' argument, although not wholly clear on the point, is that the purposive language of the Copyright Clause constitutes a substantive limit on Congress's legislative power, and that it only refers to the need to provide economic incentives in the form of royalties.

There are a number of problems with appellants' position less obvious than their failure to cite any relevant authority for either proposition. Professor Nimmer apparently does not agree with the appellants' interpretation of the introductory phrase as a limitation upon congressional power: "[T]he introductory phrase, rather than constituting a limitation on Congressional authority, has for the most part tended to expand such authority." 1 Nimmer on Copyright § 1.03[B].

**3.** It might also be contended that this statement, and the proposition drawn from it that the United States may receive a copyright by assignment, is dictum. The United States had bought the letters from an unnamed party. The letters were sold subject to plaintiff's pre-existing copyright, which was not conveyed with the letters themselves. *See* 9 F.Cas. at 345, 347. The holding of Justice Story's opin-

ion on the effect of congressional acquisition appears to be no more than an application of the venerable principle of property law that "[t]he vendor . . . could convey no title which he did not himself possess." *Id.* at 347. Congress did not obtain the copyright; it remained with the plaintiff, and was not extirpated by the sale of the letters to the Government. *Id.*

112

The Fifth Circuit, in holding that a copyright may subsist in a work judged obscene, has, we think, stated the proper scope for judicial review of challenges to congressional power based upon the supposed limits of the Copyright Clause:

> Congress has authority to make any law that is 'necessary and proper' for the execution of its enumerated Article I powers, ... including its copyright power, and the courts [*sic*] role in judging whether Congress has exceeded its Article I powers is limited. The courts will not find that Congress has exceeded its power so long as the means adopted by Congress for achieving a constitutional end are 'appropriate' and 'plainly adapted' to achieving that end. *McCulloch v. Maryland* .... It is by the lenient standard of *McCulloch* that we must judge whether Congress has exceeded its constitutional powers in enacting an all-inclusive copyright statute.

*Mitchell Brothers Film Group v. Cinema Adult Theater*, 604 F.2d 852, 860 (5th Cir. 1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1277, 63 L.Ed.2d 601 (1980). Having stated a standard for judicial review that we today endorse, the Fifth Circuit applied that standard to conclude that Congress need not "require that each copyrighted work be shown to promote the useful arts ...." 604 F.2d at 860. That being so, we cannot accept appellants' argument that the introductory language of the Copyright Clause constitutes a limit on congressional power. Furthermore, as our earlier discussion implies, we would have serious difficulty reaching the conclusion that prohibiting copyrights in public television programs produced with government support would do much to advance the useful arts.

■ We have come to the conclusion that neither the old nor the new copyright law proscribes, the registration of works commissioned by the Government for copyright, and that Congress possessed the power to enact these laws. In addition, when there is no allegation that the Government and the contractor have attempted to subvert the copyright laws through an assignment subsequent to registration of a commissioned work, we find that the copyright laws, in their present as well as former incarnation, will permit such an assignment. Therefore we agree with the District Court that, with respect to the copyright laws, the appellants have failed to state a claim for which relief may be granted against the AO, WQED, PBS, and the Register of Copyrights. Since the complaint fails to allege that WETA took any action with respect to the registration or assignment of the copyright in "Equal Justice Under Law," it has, on this point, also failed as a matter of law against WETA.

IV

■ Appellants contend that the application of the copyright laws to works commissioned by the Government is, if authorized by Congress, violative of the First Amendment. Before analyzing the merits, if any, of their argument, we must first inquire into their standing to raise it. The complaint did not allege that the appellants were denied access to the works of a willing speaker by the existence of the copyright. Therefore, the doctrine that the First Amendment protects the right of the listener to receive information from a willing speaker would appear to have no relevance to the instant case. *See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 756–57, 96 S.Ct. 1817, 1822–1823, 48 L.Ed.2d 346 (1976); *see generally* Note, *The Right to Know in First Amendment Analysis*, 57 Tex.L.Rev. 505 (1979).

■ Nor can we treat the complaint's allegation that those not living within the range of a signal from a public television station are injured by the failure of defendants to make the work available to commercial broadcasters, because appellant Schnapper, according to the Complaint, lives within the area served by public television station WETA. Complaint, ¶ 8. His attempted representation of those living in areas not served by public broadcasting constitutes an assertion of the interests of third parties, and we cannot, under the standards

articulated in *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1978), countenance this endeavor.

In *Singleton*, the Supreme Court reached the conclusion that a doctor could assert the interests of potential patients in challenging a state law forbidding the expenditure of Medicaid funds for abortions by applying standards intended as rules of decision for all claims of *jus tertii*. We are thus bound to apply them in this case. The Court first looked to determine whether the interests of plaintiff and the third party were inextricably intertwined, and found such a connection in the relationship of doctor to patient. 428 U.S. at 114–15, 96 S.Ct. at 2874. We find no such relationship between those who can watch public television, and those who cannot. What affects one group need not and most likely would not affect the other. Second, the Court examined whether the third party could adequately represent its own interests, and found that impecunious pregnant women were unlikely to do so. 428 U.S. at 116–17, 96 S.Ct. at 2875. We see no obstacle to the institution and prosecution of a civil action by the third parties in this case.

The rationale for the stringent application of the doctrine of *jus tertii* to bar most assertions of third-party claims is also directly relevant to this litigation. The *Singleton* Court explained that *jus tertii* was based in part on the notion that "the courts should not adjudicate such rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not." 428 U.S. at 113–14, 96 S.Ct. at 2873–2874. It may be that no one other than appellants is at all concerned about the existence of a copyright in "Equal Justice Under Law," or that those to whom public broadcasting is not available have no interest in the films, or have arranged for alternative access, or even that few, if anyone, live within range of commercial, but not public broadcasting. For these reasons, we are compelled to dismiss appellants' efforts to assert the purported First Amendment interests of these third parties.

█ The final threshold matter is appellants' allegation of injury to itself and the purported class of viewers of WETA residing in WETA's supposed failure to show all five films in the series. We are compelled to conclude that the appellants lack standing to maintain this claim, because they have failed to allege any link between the illegal conduct alleged, which is the maintenance of the copyright, and the purported injury, which is their inability to watch the entire series on WETA.

To satisfy the constitutional requirements for standing, a plaintiff must assert that the actual or threatened injury is "a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). But appellants do not allege that WETA's failure to show the complete series was caused by its inability to do so on the basis of the copyright. In addition, the plaintiff "must always have suffered 'a distinct and palpable injury to himself' . . . likely to be redressed if the requested relief is granted." 441 U.S. at 100, 99 S.Ct. at 1608 (citations omitted). Once again, there is no allegation, and no reason to believe, that voiding the copyright would induce WETA to air the complete series.

Appellants' surviving First Amendment claims number but two: (1) that they have a constitutional right to reprint the screenplays for commercial gain, and (2) that the defendants acted unconstitutionally in failing to disclose the extent of government involvement in the series. Neither is meritorious.

Appellants' assertion of a right to a compulsory license for the republication of the scripts in book form is presumably based upon the First Amendment, because they have not argued that any provision of the Copyright Act, either old or new, requires the compulsory licensing of copyrighted works, with certain exceptions not relevant here, *e.g.*, 17 U.S.C. §§ 111(c), 115 (Supp. I

1977).[4] Appellants do not allege whether they would pay WQED for these reprint rights, and their post-argument correspondence strongly suggests that they would not, inasmuch as they requested WQED to "waive" its copyright, rather than consider the sale of a license. However, the face of their complaint leaves open the possibility that they would pay royalties, and our analysis will proceed from the presumption that what they are asking for is a forced sale of the rights at issue.

■ The appellants have not indicated which First Amendment interests they feel would be served by judicial creation of a compulsory licensing scheme in derogation of the law of copyright as passed by Congress. We conclude that in this case, where there is no judicially cognizable allegation that the interested public has been denied access to these works, the balance of the First Amendment interests is, if anything, tilted in the direction of the holders of copyrights.

It was Chief Judge Fuld who noted that important free speech interests are served by allowing the creator of a copyrighted work to publish it as he saw fit:

Copyright . . . rests on the assumption that there are forms of expression, limited in kind, to be sure, which should not be divulged to the public without the consent of their author. The purpose, far from being restrictive, is to encourage and protect intellectual labor . . . . The essential thrust of the First Amendment is to prohibit improper restraints on the *voluntary* public expression of ideas; it shields the man who wants to speak or publish when others wish him to be quiet. There is necessarily, and within suitably

defined areas, a concomitant freedom *not* to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect.

*Estate of Hemingway v. Random House*, 23 N.Y.2d 341, 348, 244 N.E.2d 250, 255, 296 N.Y.S.2d 771, 778 (1968). We see no reason why the same freedom should not be granted to the unwilling speaker when it is a public television station. There is no question but that these non-commercial broadcasters "are fully protected by the First Amendment." *Community-Service Broadcasting v. FCC*, 593 F.2d 1102, 1110 (D.C. Cir.1978) (en banc).

Chief Judge Fuld's statements explain why this court should not compel WQED to issue a license even if offered a royalty or other payment. The First Amendment interests to which he adverted are not based upon a desire for pecuniary gain, but upon the author's freedom to speak or remain silent as an end in itself. The protection of the right of the speaker to remain silent has been of continuing concern to First Amendment jurisprudence. In discussing the media's right to refrain from transmitting the words of diverse parties, Professor Schmidt has stated:

[T]he tradition of the First Amendment, and important decisions related to this tradition, define a scope for the Amendment that is not instrumental, not designed to shape the political process, and not a policy of efficiency in democratic self-governance. Against a historical perspective of religious and political autonomy required access assumes a more questionable theoretical posture.

B. Schmidt, Jr., Freedom of the Press vs. Public Access 35 (1976).[5] We therefore con-

---

4. Unless there is a specific exception, we take Congress to have vested in the copyright holder the liberty not to license rights in his work. Section 201(e) of the new Act is a general prohibition against recognizing involuntary transfers except in bankruptcy, 17 U.S.C. § 201(e) (Supp. III 1979). The legislative history states: "The purpose of this subsection is to reaffirm the basic principle that the United States copyright of an individual author shall be secured to that author, and cannot be taken away by any involuntary transfer." H.R.Rep.

No.1476, 94th Cong., 2d Sess. 123 (1976), U.S. Code Cong. & Admin.News 1976, p. 5739.

5. Closely related to the author's right to remain silent is the author's right to limit the subsequent use of his work to protect his artistic reputation. This interest has been recognized by Congress in the new Copyright Act. Note, *An Author's Artistic Reputation under the Copyright Act of 1976*, 92 Harv.L.Rev. 1490 (1979). The commentator concludes:

clude that the liberty of WQED to grant or deny a license to appellants, either gratuitously or for compensation, does not offend either the First Amendment or its underlying values.[6]

■ For similar reasons, we are not inclined to grant appellants' request that we require public broadcasters to, in the words of the complaint, "disclose[ ] the existence or extent of government control of the content of the films," Complaint ¶ 15, on First Amendment grounds. The First Amendment cannot be used to force the unwilling author to speak when he would rather remain silent, as we have just explained *supra*.[7]

Underlying the appellants' First Amendment assault on the copyright obtained for "Equal Justice Under Law" is their professed concern that the Government may one day attempt to use the copyright law as an instrument of censorship. They seem to argue that if the Pentagon Papers could have been copyrighted, their publication could have been enjoined. Appellants' Br. at 35–36. We think that Justice Brennan, concurring in the Pentagon Papers case, *New York Times Co. v. United States*, 403 U.S. 713, 726 n.*, 91 S.Ct. 2140, 2147, 29 L.Ed.2d 822 (1971), put this fear to rest:

[C]opyright cases have no pertinence here; the Government is not asserting an interest in the particular form of words chosen in the documents, but is seeking to suppress the ideas expressed therein. And the copyright laws, of course, protect only the form of expression and not the ideas expressed.

We are aware that there is at least a theoretical possibility that some copyright laws may be used by some nations as instruments of censorship. Fears had been expressed, for example, that the Soviet Union would, through use of a compulsory-assignment provision in its domestic copyright laws, attempt to prevent foreign publication of dissident works whose copyright it had assumed. *See* Newcity, *The Universal Copyright Convention as an Instrument of Repression: The Soviet Experiment* in Copyright Law Symposium No. 24 (1980). The congressional response to this perceived threat was 17 U.S.C. § 201(e) (Supp. I 1977), protecting authors from involuntary transfers. *See* H.R.Rep.No.1476, 94th Cong., 2d Sess. 123 (1976), U.S.Code Cong. & Admin.News 1976, p. 5659, note 4 *supra*.

We are unaware, however, of any effort on the part of the United States Government to throttle free expression through use of the copyright laws, and we are not inclined to hypothesize such an effort nor to hand down a decision invalidating an act of Congress on that hypothetical basis. It is important in this regard to recall that there is no tenable allegation in this case that any person interested in viewing "Equal Justice Under Law" has been denied the opportuni-

---

The 1976 Copyright Act may be interpreted to afford authors a limited right of artistic reputation in their works. By granting authors rights against the unauthorized use of their works, including failure to reproduce the work as the author created it, the Act allows an author to secure her reputation in a literary or artistic work.

Note, *supra*, at 1515. We think that this provides further support for our conclusion that the goals of the copyright law and the First Amendment do not conflict.

6. Nothing in the preceding discussion is intended to cast any doubt upon the constitutionality of the compulsory-licensing schemes in the new Copyright Act.

7. We could as well dismiss this allegation on standing grounds. As appellant Schnapper presumably knows who financed the films and exercised "control" over them, he is hard put to aver that he has been injured by the appellees' supposed failure to disclose. And since his knowledge presumably sets him apart from the class he purports to represent, he is both an unsuitable representative of said class and is once again attempting to assert the interests of unrelated third parties perfectly capable of protecting themselves. We note that he does not seek *more* information with respect to the various roles of the several appellees in the production of "Equal Justice Under Law," and that he has not alleged that this further information is not forthcoming from appellees. He is therefore unable to predicate standing upon an informational interest. *See Scientists' Institute for Public Information v. AEC*, 481 F.2d 1079, 1086–87 n. 29 (D.C.Cir.1973); Note, *Informational Interests as a Basis for Standing*, 79 Colum.L.Rev. 366 (1979).

ty to do so, or that copies of the films and their scripts are other than freely available for public inspection.

We are confident that should the day come when the Government denies someone access to a work produced at its direction on the basis of a copyright, and if the doctrine of fair use and the distinction between an idea and its expression fail to vindicate adequately that person's interests—although we have no reason to believe that they would—the courts of the United States would on the basis of facts, not hypotheses, consider afresh the First Amendment interests implicated thereby. We are sure that they will comprehend the difference between that case and this one.

## V

Appellants contend that three other legal bases support their various requests for injunctive and declaratory relief. We conclude that they do not.

■■■ Appellants' request for relief under the Public Broadcasting Act fails because that statute provides no private right of action that is available to the appellants. *Network Project v. Corporation for Public Broadcasting*, 561 F.2d 963, 972–76 (D.C.Cir. 1977), *cert. denied*, 434 U.S. 1068, 98 S.Ct. 1247, 55 L.Ed.2d 770 (1978). Contrary to appellants' assertions, nothing in *Community-Service Broadcasting v. FCC*, 593 F.2d 1102 (D.C.Cir.1978) (en banc), which was a challenge mounted by broadcasters on constitutional grounds, places the holding of *Network Project* in any doubt. *See* 593 F.2d at 1109–10.

■■■ Appellants lack standing to sue under the Property Clause, art. IV, sec. 3, because they are unable to allege an injury to an interest that the Framers of the Property Clause sought to protect. The intendment of article IV, section 3, this court has held, was "to preserve both federal claims and conflicting state claims to certain portions of" unsettled lands west of the Allegheny Mountains. *Edwards v. Carter*, 580

F.2d 1055, 1059 (D.C.Cir.), *cert. denied*, 436 U.S. 907, 98 S.Ct. 2240, 56 L.Ed.2d 406 (1978). Although the historical basis of the Property Clause may not limit congressional power to legislate with respect to it, 580 F.2d at 1059, it does serve to narrow the class of persons who can predicate standing upon the Property Clause. It has been established that taxpayer standing is never available and consumer standing unlikely to be available to those asserting a Property Clause claim. *Public Citizen v. Sampson*, 379 F.Supp. 662 (D.D.C.1974), *aff'd*, 515 F.2d 1018 (D.C.Cir.1975). We think that neither an interest in the commercial republication of copyrighted material nor an interest in government disclosure is protected by the Property Clause. Appellants, unable to demonstrate injury in fact to an interest that the Property Clause arguably protects, lack standing to sue. *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 152–54, 90 S.Ct. 827, 829–830, 25 L.Ed.2d 184 (1970). Our disposition on this preliminary ground enables us to pretermit the question of whether anyone may assert a judicially cognizable claim for relief under the Property Clause, as well as the merits, if any, of appellants' claim.

■■■ Finally, appellants may not maintain their claim on the basis of section 309(a) of the Communications Act of 1934, 47 U.S.C. § 309(a) (1976). That section vests the Federal Communications Commission with the authority and the duty to determine whether granting a broadcast license to a particular applicant would serve the public interest, convenience, and necessity. It is the law of this court that it may not determine the disposition of controversies that Congress has committed to the discretion of the FCC. *American Broadcasting Co. v. FCC*, 191 F.2d 492, 501–02 & n.12 (D.C.Cir.1951); *see also Scripps-Howard Radio v. FCC*, 316 U.S. 4, 14, 62 S.Ct. 875, 882, 86 L.Ed. 1229 (1942); *FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 137–38, 60 S.Ct. 437, 438–439, 84 L.Ed. 656 (1940).[8] The FCC is the exclusive forum

---

8. For other examples of judicial refusal to imply private causes of action under the Commu-

nications Act, see *Daly v. CBS*, 309 F.2d 83, 85–86 (7th Cir. 1962); *Post v. Payton*, 323

for appellants' claims that producing and broadcasting "Equal Justice Under Law" disserved the public interest contrary to section 309(a).

## VI

The judgment of the District Court from which this appeal was taken is affirmed.

*It is so ordered.*

F.Supp. 799, 801–02 (S.D.N.Y.1971); *Gordon v. NBC*, 287 F.Supp. 452, 455 (S.D.N.Y.1968). *Contra, Lorentz v. Westinghouse Electric Corp.*, 472 F.Supp. 946 (N.D.Pa.1979) (suit for damages allowed under Communications Act because Commission could not award comparable relief).